```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
NATIONAL IMMIGRATION PROJECT OF THE   :
NATIONAL LAWYERS GUILD, AMERICAN      :
CIVIL LIBERTIES UNION FOUNDATION,     :
IMMIGRANT DEFENSE PROJECT, POST-      :
DEPORTATION HUMAN RIGHTS PROJECT, and :
RACHEL ROSENBLOOM,                    :
                                      :
                    Plaintiffs,       :
                                      :
               -v-                    :      11 Civ. 3235(JSR)
                                      :
UNITED STATES DEPARTMENT OF HOMELAND  :      OPINION AND ORDER
SECURITY, UNITED STATES CITIZENSHIP   :
AND IMMIGRATION SERVICES, UNITED      :
STATES CUSTOMS AND BORDER PROTECTION, :
UNITED STATES IMMIGRATION AND CUSTOMS :
ENFORCEMENT, UNITED STATES DEPARTMENT :
OF JUSTICE, UNITED STATES DEPARTMENT  :
OF STATE,                             :
                                      :
                    Defendants.       :
------------------------------------- x
```



JED S. RAKOFF, U.S.D.J.

"Trust everybody, but cut the cards," as the old saying goes.[1] When the Solicitor General of the United States makes a representation to the Supreme Court, trustworthiness is presumed. Here, however, plaintiffs seek to determine whether one such representation was accurate or whether, as it seems, the Government's lawyers were engaged in a bit of a shuffle.

---

[1] The source of the saying may be Peter Finley Dunne, the great Irish-American political commentator of the late nineteenth and early twentieth centuries. See Peter Finley Dunne, Mr. Dooley's Philosophy 254 (Harper & Bros. Publishers 1906) (1900) ("Thrust ivrybody – but cut th' ca-ards.").

Specifically, in 2009, in a brief addressed to the Supreme Court, the Office of the Solicitor General ("OSG") represented that, "[b]y policy and practice, the government accords aliens who were removed pending judicial review but then prevailed before the courts effective relief by, inter alia, facilitating the aliens' return to the United States by parole under 8 U.S.C. 1182(d)(5) if necessary, and according them the status they had at the time of removal." Brief for Respondent at 44, Nken v. Holder, 129 S. Ct. 1749 (2009) (No. 08-681), 2009 WL 45980 at *44. Although the OSG did not support this assertion with any citation, id., the Supreme Court in Nken, in holding that deportation of an alien before the resolution of an appeal from her order of removal does not constitute irreparable injury, expressly relied on this representation, stating that, "those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal. See Brief for Respondent 44." Nken, 129 S. Ct. at 1761.

To discover the factual basis for the OSG's representation and determine the details of the asserted policy, plaintiffs in this case filed a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, with the Department of Justice ("DOJ"), Department of State ("DOS"), and Department of Homeland Security ("DHS"). In response to that request, the OSG produced a mostly-redacted four-page chain of emails between the attorneys who argued before the Supreme

Court in Nken and other government officials. See Decl. of Patricia L. Buchanan dated October 28, 2011 Ex. B. The OSG sought to justify the wholesale redactions on the basis of three privileges embodied in 5 U.S.C. § 552(b)(5): the work-product privilege,[2] the attorney-client privilege, and the deliberative-process privilege.

On October 11, 2011, plaintiffs filed a motion for summary judgment, requesting that this Court order disclosure of the contents of the emails. On October 31, 2011, the Government cross moved for summary judgment, requesting that the Court uphold the assertions of privilege. Both parties consented to in camera review of the emails. See Government's Memorandum of Law dated October 28, 2011 at 25; Plaintiffs' Memorandum of Law in Reply to Government's Opposition dated November 9, 2011 at 10. Accordingly, the Court conducted such a review. Based on that review, and the parties' submissions and arguments, the Court hereby partially grants and partially denies the motions by ordering disclosure of the portions of the emails that contain factual statements concerning the aforementioned policy and practice.

"Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." Bloomberg L.P. v. Bd. of Governors of Federal Reserve Sys., 649 F. Supp. 2d 262, 271 (S.D.N.Y. 2009).

---

[2] Some authorities state that work-product is technically not a "privilege," but instead a "doctrine," see In re Qwest Commc'ns Int'l, 450 F.3d 1179, 1184 n.3 (10th Cir. 2006), but the distinction is too obscure to warrant further discussion here.

3

Although a party requesting summary judgment must demonstrate that there is "no genuine dispute as to any material fact" and that she is "entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(a), here the essential facts are undisputed:[3]

On December 17, 2009, plaintiffs filed a FOIA request with the DOJ, the DHS, and the DOS seeking information about the factual basis for the representation made in Nken, viz., that the Government has a policy and practice of facilitating deported aliens' return and restoring their prior immigration status if they successfully appeal their removal decisions. Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 13. The DOS did not produce any records in response to plaintiffs' request. Id. ¶ 22. The DOJ referred the request to the OSG, and on February 8, 2011, after some clarification by plaintiffs, the OSG informed plaintiffs that a search yielded only the four-page email chain at issue in this opinion. Id. ¶¶ 14-17. The OSG indicated that it would withhold those records under 5 U.S.C. § 522(b)(5). Id. The DOJ also referred plaintiffs' request to its Civil Division, which produced only two, here-irrelevant documents and a list of cases. Id. ¶ 20.

---

[3]The Government chose neither to controvert plaintiffs' Rule 56.1 Statement of Uncontested Facts nor to propound its own Rule 56.1 statement in support of its cross-motion. Instead, the Government submitted the Declaration of Patricia L. Buchanan dated October 28, 2011, which included two exhibits: a September 2008 Memorandum of Agreement ("MOA") between three components of the DHS and a copy of the Government's original disclosures concerning the four-page email chain at issue in this case.

4

The DHS referred plaintiffs' FOIA request to three of its divisions: Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and Citizenship and Immigration Services ("CIS"). Id. ¶ 23. CIS responded by referring plaintiffs to two forms used by individuals who have been deported or are inadmissible. Id. ¶ 24. Neither form contains any specific information for individuals whose removal orders are reversed. Id. ¶¶ 25-26. In response to further requests, on May 24, 2011, CIS wrote, "USCIS does not have a specific policy, program and/or guidance memo regarding a process for aliens wrongfully removed/deported from the United States." Id. ¶ 28, Ex. L. CBP informed plaintiffs that it has no set procedure for facilitating return. Id. ¶ 33. CBP does not track cases referred for judicial action and has no method for identifying whether an alien has succeeded on appeal. Id. ¶ 35.

ICE identified 2,650 pages of responsive records, and plaintiffs agreed to receive 500 pages every two weeks. Id. ¶ 31. As of October 7, 2011, plaintiffs had received 1,000 pages. Id. ¶ 32. None of the records produced identifies a written policy. Id. ¶ 36. In some instances, significant public benefit parole is used to return aliens who have prevailed on appeal. Id. ¶ 38, Ex. Y. ICE records show that officials frequently do not know whom they should contact to facilitate return. Id. ¶ 39. In some situations where ICE used parole, agency employees still expressed confusion about how to physically return a deportee. Id. ¶ 42, Ex. X. For example, in one

email from 2009, an undisclosed person writes, "How this is handled has alw [redacted] haphazard." Id. ¶ 44, Ex. X. Other records admit that the Government's use of parole would not restore the status that removed aliens had prior to their removal. Id. ¶ 48. ICE records do not contain any publicly accessible forms or instructions for individuals whose removal orders have been reversed or vacated. Id. ¶ 50.

On August 8, 2011, the Government directed plaintiffs' attention to a Memorandum of Agreement ("MOA") between CIS, ICE and CBP. Id. ¶ 45. As noted, supra, the MOA is also one of the two documents that the Government provided for this litigation. Decl. of Patricia L. Buchanan dated October 28, 2011, Ex. A (MOA). An Addendum to the MOA provides that:

> ICE will adjudicate parole requests relating to aliens in removal proceedings or who have final orders, as well as aliens granted deferred action by ICE at any point after the commencement of removal proceedings, regardless of whether the alien is within or outside of the United States. Given the context of removal proceedings, it is anticipated that parole of such aliens would occur only in very rare circumstances.

Id. at 6. The MOA also notes that, under current practice, "DHS bureaus have generally construed 'humanitarian' paroles . . . as relating to urgent medical, family, and related needs and 'significant public benefit paroles [sic] . . . as limited to persons of law enforcement interest such as witnesses to judicial proceedings." Id. at 2.

Against this factual background, the Court turns to the issues of law. "Upon request, FOIA mandates disclosure of records held by a federal agency, see 5 U.S.C. § 552, unless the documents fall within enumerated exemptions, see § 552(b)." <u>Dep't of Interior v. Klamath Water Users Protective Ass'n</u>, 532 U.S. 1, 8 (2001). Furthermore, FOIA specifically requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B). Nonetheless, FOIA, under 5 U.S.C. § 552(b)(5), exempts from production documents protected by the attorney-client, work-product, and deliberative-process privileges.[4] Whenever the Government invokes a FOIA exemption, it bears the burden of "establish[ing its] right to withhold information from the public." <u>Coastal States Gas Corp. v. Dep't of Energy</u>, 617 F.2d 854, 861 (D.C. Cir. 1980).[5]

The plaintiffs argue that the facts set forth in their Rule 56.1 statement reveal (i) that confusion exists about how aliens who prevail on appeals from their removal orders may obtain effective

---

[4] By enacting 5 U.S.C. § 552(b)(5), "Congress intended to incorporate into the FOIA all the normal civil discovery privileges." <u>Hopkins v. U.S. Dep't of Housing and Urban Dev.</u>, 929 F.2d 81, 84 (2d Cir. 1991).

[5] Similarly, where agencies claim that "non-exempt material is not reasonably segregable" from exempt material, they must provide a "detailed justification" for that claim. <u>Mead Data Central, Inc. v. U.S. Dep't of Air Force</u>, 566 F.2d 242, 261 (D.C. Cir. 1977).

7

relief, (ii) that no widely known procedures exist for restoring those aliens to the status they had before their removals, and (iii) that the public has neither knowledge of nor access to the policies and procedures to which the OSG referred in Nken. Thus, they claim that disclosure of the email chain at issue in this case will either clarify the policy for the public or reveal how the OSG mistakenly asserted that a policy existed when none, in fact, did. At oral argument, the Government conceded that it does not dispute that plaintiffs have a proper basis for making a FOIA request. See Transcript, 11/17/11, at 27:14-15. Rather, as noted above, the Government argues that the attorney-client, the work-product, and the deliberative-process privileges protect the entire contents of the four-page email chain from disclosure. The Court considers each of these privileges in turn, finding that none protects statements of fact in the email chain that relate to the representation the OSG made in Nken.

Turning first to the work-product privilege, this privilege protects an attorney's ability to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." Hickman v. Taylor, 329 U.S. 495, 511 (1947). The privilege is now codified in Federal Rule of Civil Procedure 26(b)(3)(A), which states: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of

8

litigation or for trial by or for another party or its representative . . . ."  The privilege often extends to "correspondence" such as the emails at issue here.  Hickman, 329 U.S. at 511.  Nonetheless, the work-product privilege "may be waived," and a litigant may "no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination."  United States v. Nobles, 422 U.S. 225, 239-40 (1975).

Plaintiffs make two related arguments for overcoming the Government's assertion of work-product privilege.  First, they argue that, because none of the other materials provided by the Government contain any evidence to support the OSG's representation in Nken, the email chain must contain the OSG's factual basis for that representation.  As a result, plaintiffs conclude, the OSG's representation constituted "unilateral testimonial use" of the email chain, and Nobles prevents the Government from asserting the work-product privilege to shield that chain from disclosure.  Second, plaintiffs argue that the "fairness doctrine," which prevents "selective disclosure during litigation of otherwise privileged information," requires the Government to disclose the email chain in order to "to prevent prejudice to [other] part[ies] and distortion of the judicial process."  In re von Bulow, 828 F.2d 94, 101 (2d Cir.

9

1987).[6] These arguments, however, apply only to the portions of the emails' contents that factually describe (or refute) the alleged policy or practice. The arguments have no relevance to the portions of the emails that describe mental impressions, litigation strategy, and other "core" work-product. It is clear to the Court, upon review of the emails, that they do contain, in part, such core work-product, see Decl. of Patricia L. Buchanan dated October 28, 2011 Ex. B (describing the emails' contents as "[c]onsultations among attorney [sic] . . . regarding draft of government's brief"), but that there are also factual recitations about existing practices that are independent of, and easily severable from, the core work-product. The Court will therefore limit its discussion to the question of whether these factual contents are protected from disclosure.

To protect even these factual contents of the email chain, the Government makes three arguments so far as work-product privilege is concerned. First, it argues that the OSG did not rely upon the email chain when it made its representation in Nken. The Government claims that, instead, the OSG relied on 8 U.S.C. § 1182(d)(5), which provides for the use of parole "for urgent humanitarian reasons or significant public benefit," and on the MOA between ICE, CBP, and CIS, which provides that "ICE will adjudicate parole requests relating to aliens

---

[6] In re von Bulow considered the attorney-client privilege rather than the work-product privilege. Nonetheless, selective disclosure of materials that the work-product privilege protects can also distort the judicial process, as the holding in Nobles recognizes.

10

in removal proceedings or who have final orders . . . regardless of whether the alien is within or outside of the United States."

As described below, the emails themselves (reviewed by the Court in camera) refute this argument on their face. Independently, moreover, the argument is without basis. Neither § 1182(d)(5) nor the MOA provide a factual basis for the claim that the Government has a "policy and practice" of "facilitating [wrongly deported] aliens' return to the United States . . . and according them the status they had at the time of removal." The MOA only allocates responsibility for adjudicating parole requests to ICE, revealing nothing about the Government's purported use of such requests for the specific purpose of returning deportees who prevail on appeal. And the language of 8 U.S.C. § 1182(d)(5) suggests, if anything, that the statute does not serve the purpose of returning deportees. Specifically, the statute provides that the Attorney General may "parole" aliens "into the United States temporarily" and that "when the purposes of such parole shall . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). Moreover, parole does not accord aliens the status they had at the time of removal. See 8 U.S.C. § 1182(d)(5)(A) (specifying that "parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall . . . have been served . . . [the alien's] case shall continue to be dealt with in the same manner as that of any other applicant for

11

admission to the United States"). In short, neither 8 U.S.C. § 1182(d)(5)(A), nor the MOA, nor any other evidence here proffered by the Government supports the suggestion that the OSG's representation in Nken was based on anything other than the facts provided to the OSG in the email chain here at issue.

By contrast, the email chain (as reviewed by the Court in camera) evidences an attempt to cobble together a factual basis for making the representation the OSG made to the Court in Nken. This basis consisted of information obtained as to how various relevant agencies commonly handle the return of deportees who prevail on appeal and the restoration of their immigration status. Given the absence of public disclosure of these agencies' practices and the Government's assertion that it has adopted a policy, such assertions must amount to a statement of that policy.[7] Accordingly, the OSG's representation - which it made in a brief to this nation's highest court - constituted "unilateral testimonial use" of the email chain at issue in this case and is not protected by work-product privilege.

Second, the Government argues that, even if the OSG made "unilateral testimonial use" of the email chain, the rules of Nobles and In re von Bulow do not apply because, in each of those cases,

---

[7]Thus, even if the work-product privilege applied here, FOIA would require disclosure of this information in some unprivileged form. See 5 U.S.C. § 552(a)(2)(B) (requiring that an agency make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register").

litigants invoked privileged materials at trial, rather than on appeal. According to the Government, different procedural safeguards apply at trial and on appeal. Thus, the Government concludes, even if at trial plaintiffs might have been entitled to disclosure of the email chain, on appeal they must rely on reply briefs and pointed questioning at oral argument.

> The Government, however, cites no authority in support of its distinction between the effect of "unilateral testimonial use" of privileged material at trial and on appeal, and the Court finds this purported distinction illusory. The Government wholly ignores the fact that, in Nken, unlike in most appeals, the OSG made a factual representation, unsupported by any citation to the record, and intended that the Court rely on it, which the Court did. In such circumstances, to claim that the procedural safeguards that attend unilateral use of a factual assertion do not apply is pure gamesmanship. Even on appeal, courts have every reason to subject the bases of parties' factual claims to some modest testing, before which any claim of work-product privilege must yield. A different approach would permit the very "distortion of the judicial process" that the fairness doctrine attempts to avoid. Indeed, in this very case, the plaintiffs have provided substantial evidence that the judicial process may have been impugned if the Supreme Court relied upon what may well have been inaccurate or distorted factual representation. Thus, the Court concludes, under Nobles, that the OSG's "unilateral

13

testimonial use" on appeal of the substance of the facts set forth in the email chain renders inapplicable the Government's recourse to the work-product privilege.

Third, the Government argues that requiring disclosure of the email chain will vitiate the work-product privilege by allowing plaintiffs to routinely access government attorneys' correspondences whenever those correspondences might arguably contain relevant factual materials. This argument, however, completely ignores the highly uncommon circumstances of this case. In Nken, the OSG made a new factual representation on appeal and cited nothing in the record to support it.[8] Moreover, the Government even now has come forward with nothing of consequence to support its representation beyond the facts set forth in the emails. These highly unusual circumstances render the Government's "slippery slope" argument unavailing.

Turning next to attorney-client privilege, this privilege "protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance. . . . Its purpose is to encourage attorneys and their clients to communicate fully and frankly . . . ." In re County of Erie, 473 F.3d 413, 418 (2d Cir. 2007) (citations omitted). "A party invoking the attorney-client privilege must show (1) a communication between client

---

[8]Importantly, the OSG did not cite 8 U.S.C. § 1182(d)(5) in support of its claim, but instead identified that statute as the procedural mechanism by which the Government implemented its alleged policy.

and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." Id. at 419. As with work-product privilege, discussed above, a party can waive attorney-client privilege by making "a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party." In re Grand Jury Proceedings, 219 F.3d 175, 184 (2d Cir. 2000).

For the reasons described above, the OSG's "unilateral testimonial use" of the factual contents of the email chain constitutes "a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party." The OSG disclosed the existence of a purported policy the details of which do not appear to reside anywhere outside the email chain. Having chosen to assert the existence of a previously undisclosed policy, the OSG cannot now claim that the attorney-client privilege protects the factual details on which it relied when it made that assertion. See In re Grand Jury Proceedings, 219 F.3d at 182 ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.").[9] Accordingly,

---

[9] That the OSG did not explicitly cite the email chain does not mean that it did not "affirmatively rely" on those emails. Otherwise, litigants would have perverse incentives to cite

15

so far as the factual contents of the emails are concerned, the OSG waived any attorney-client privilege that may have attached.

Independently, moreover, the Court further finds that no attorney client privilege attached. As noted above, this privilege attaches only where information "was intended to be and was in fact kept confidential." FOIA specifically requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B). Under § 552(a)(2)(B), to the extent that the OSG's client agencies described an existing but otherwise unknown policy to the OSG, those agencies had a duty under FOIA to make statements of that policy publicly available. Thus, FOIA barred those agencies from intending to keep statements of their policy confidential. Concluding that attorney-client privilege applied would amount to a finding that the client agencies articulated a policy solely for the purposes of litigation. But, of course, agencies cannot limit the application of a policy to a particular case in which having such a policy would prove beneficial. Accordingly, attorney-client privilege did not attach to any factual descriptions of the policy asserted by the OSG in Nken.[10]

---

nothing in support of their most dubious factual claims, knowing that, while a court might rely on those claims, it could never scrutinize them because of attorney-client privilege.

[10]Resisting this conclusion, the Government argues that "[f]actual information provided by the client to the attorney is the essence of the privilege." Vento v. IRS, 714 F. Supp. 2d

16

Turning finally to the deliberative-process privilege, this privilege has "a number of purposes:"

> it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

Coastal States Gas Corp., 617 F.2d at 866. "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975).

While it follows from this that the privilege applies where an agency makes a decision about, for example, what policy to adopt, here the Government concedes that the email chain does not contain "deliberations about creating a new policy to return aliens." Government's Memorandum of Law dated October 28, 2011 at 24. Nonetheless, the Government argues that, because a statute commits to the OSG's discretion the decision of how to present the Government's arguments before the Supreme Court, see 28 U.S.C. § 518(a) ("[T]he Solicitor General shall conduct and argue suits and appeals in the

---

137, 151 (D.D.C. 2010). While attorney-client privilege certainly protects a client's private information, FOIA prohibits agencies from treating their policies as private information. Thus, attorney-client privilege simply does not apply to statements of policy, at least in the circumstances of this case.

17

Supreme Court . . . ."), the OSG is somehow the relevant agency for application of the deliberative process privilege to the factual contents of the emails.

The Government cites no case in support of this novel construction of the deliberative-process privilege, and the Court declines to adopt it.[11] So construed, the deliberative-process privilege would wholly displace the work-product privilege, protecting the same materials without providing the same exceptions. Statutes commit the authority to litigate on the Government's behalf to many different parts of the DOJ. See, e.g., 28 U.S.C. § 515(a) ("The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may . . . conduct any kind of legal proceeding, civil or criminal."); 28 U.S.C. § 519 ("[T]he Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."). Surely an Assistant United States Attorney could not make "unilateral

---

[11] Of course, the OSG's presentation of the Government's position to a court differs substantially from an offer of legal advice to an agency considering the legal implications of a proposed policy, to which he deliberative-process privilege would often apply. See Brinton v. Dep't of State, 636 F.2d 600, 604 (D.C. Cir. 1980). Nonetheless, the Government concedes that no agency considered adopting a new policy in the email chain, and thus the OSG could not have offered any legal advice on such a proposal.

18

testimonial use" of attorney work-product at trial and then claim that the deliberative-process privilege protected that work-product - even though the work-product privilege did not - because 28 U.S.C. § 515(a) gave her and her superiors discretion to decide how to conduct the litigation. Such a result would mean that 5 U.S.C. § 552(b)(5), rather than preserving "normal" discovery privileges for the Government, in fact gave the Government more extensive privileges. Accordingly, the Court declines to adopt the Government's expansive construction of the deliberative-process privilege. Because the Government concedes that the email chain does not contain "deliberations about creating a new policy to return aliens," the Court finds that the deliberative-process privilege does not protect the email chain from disclosure.

In sum, the Court finds that, while the work-product privilege protects those parts of the email chain that do not contain factual descriptions of the policy to which the OSG referred in Nken, neither the work-product privilege, nor the attorney-client privilege, nor the deliberative-process privilege protects the parts of the email chain that do contain such factual descriptions. Moreover, the Court finds that the Government has not provided any justification, much less a "detailed justification," for finding that the non-exempt material in the email chain "is not reasonably segregable" from the exempt material. Mead Data Central, 566 F.2d at 261. Accordingly, the Court partially grants plaintiffs' motion for summary judgment and orders

19

the Government to disclose the portions of the email chain that contain factual descriptions of the putative policy the existence of which the OSG asserted in <u>Nken</u>. Based on its <u>in camera</u> review of the email chain, the Court concludes that the following portions contain such descriptions:

(1) in the email sent Wednesday, December 31, 2008 at 5:13 PM, the first sentence of the first paragraph and the entire second paragraph;

(2) in the email sent Friday, January 2, 2009 at 2:13 PM, the entire second paragraph;

(3) in the email sent Monday, January 5, 2009 at 6:32 PM, the third and fourth sentences;

and (4) in the email sent Wednesday, January 7, 2009 at 12:29 PM, the second and third paragraphs.

Barring further applications, the Government is directed to disclose these portions to plaintiffs by no later than February 13, 2012. In the meantime, the Court will file under seal a complete copy of the entire email chain that it reviewed <u>in camera</u>. In all other respects, the plaintiffs' motion is denied and the Government's cross-motion is granted, and the Clerk of the Court is ordered to close documents number 14 and 20 on the docket of this case.

SO ORDERED.

                                                  JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       February 7, 2012