```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
NATIONAL IMMIGRATION PROJECT OF THE   :
NATIONAL LAWYERS GUILD, AMERICAN      :
CIVIL LIBERTIES UNION FOUNDATION,     :
IMMIGRANT DEFENSE PROJECT, POST-      :
DEPORTATION HUMAN RIGHTS PROJECT, and :
RACHEL ROSENBLOOM,                    :
                                      :
              Plaintiffs,             :
                                      :
           -v-                        :           11 Civ. 3235(JSR)
                                      :
UNITED STATES DEPARTMENT OF HOMELAND  :           OPINION AND ORDER
SECURITY, UNITED STATES CITIZENSHIP   :
AND IMMIGRATION SERVICES, UNITED      :
STATES CUSTOMS AND BORDER PROTECTION, :
UNITED STATES IMMIGRATION AND CUSTOMS :
ENFORCEMENT, UNITED STATES DEPARTMENT :
OF JUSTICE, UNITED STATES DEPARTMENT  :
OF STATE,                             :
                                      :
              Defendants.             :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

The parties have each filed partial summary judgment motions with respect to certain (though not all) aspects of plaintiffs' request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for extensive records relating to a representation made in 2009 -- in a brief submitted on behalf of the Government to the Supreme Court -- that, "[b]y policy and practice, the government accords aliens who were removed pending judicial review but then prevailed before the courts effective relief by, _inter alia_, facilitating the aliens' return to the United States by parole under 8 U.S.C. 1182(d)(5) if necessary, and according them the status they had at the time of removal." Brief for Respondent at 44, _Nken v. Holder_, 556 U.S. 418 (2009) (No. 08-681), 2009 WL 45980 at *44. Although the Office of the

Solicitor General ("OSG"), the author of the brief, did not support this assertion with any citation, id., the Supreme Court in Nken, in holding that deportation of an alien before the resolution of an appeal from her order of removal does not constitute irreparable injury, expressly relied on this representation, stating that, "those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal. See Brief for Respondent 44."   Nken, 556 U.S. at 435.

The parties' prior submissions in this action made clear that this representation was likely in need of correction. See generally Nat'l Immigration Project v. Dep't of Homeland Sec., 2012 WL 375515 (S.D.N.Y. Feb. 7, 2012). Accordingly, the OSG, in a letter to the Supreme Court dated April 24, 2012, informed the Court that "the government is not confident that the process for returning removed aliens, either at the time its brief was filed or during the intervening three years, was as consistently effective as the statement in its brief in Nken implied." Letter from Michael R. Dreeben, Deputy Solicitor Gen., Office of the Solicitor Gen., to the Honorable William K. Suter, Clerk, the Supreme Court of the U.S. (Apr. 24, 2012) [hereinafter "OSG Letter"]. In addition, the Government took certain remedial steps.

First, Immigration and Customs Enforcement ("ICE") issued a new directive that "describes existing ICE Policy for facilitating the return to the United States of certain lawfully removed aliens whose [petitions for review ('PFRs')] are granted by a U.S. court of appeals

or the U.S. Supreme Court." See ICE Directive 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012) (attached as Appendix B to the OSG Letter) ("Directive 11061.1"). The directive clarifies that:

> Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings.

Id. Moreover, the directive provides that ICE "will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order." Id. Facilitating an alien's return can mean "issuing a Boarding Letter to permit commercial air travel" and, "if warranted, parol[ing] the alien into the United States upon his or her arrival at a U.S. port of entry." Id.

Second, to implement this directive, ICE identified its "Public Advocate" as an initial point of contact for deported aliens who prevail on their appeals. OSG Letter at 4. The Public Advocate will direct any alien who contacts it to the office within ICE, or, if necessary, within another governmental agency, that can provide appropriate assistance. Id. Moreover, the State Department has informed its embassies and consulates that, if a deported alien who prevails on appeal makes contact, they should refer that alien to ICE's Public Advocate. Id. at 5.

The Government's efforts are laudable, but, of course, do not moot plaintiffs' FOIA request, which is also directed at ascertaining the extent to which the Government's past practices comported with the OSG's representations in Nken. See Fed. Labor Relations Auth. v. Dep't of Veterans Affairs, 958 F.2d 503, 506 (2d Cir. 1992) ("FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny." (quoting Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 774 (1989))). Plaintiff's original FOIA request, filed on December 17, 2009 with, among other agencies, the Department of Homeland Security ("DHS"), sought information about how DHS facilitated the return of individuals "who were removed from the United Stated by the (DHS) or who left the country after accepting voluntary departure or self-deportation and (a) whose removal orders were subsequently vacated or reversed by any United States federal court and/or (b) whose immigration cases have subsequently been reopened by an Immigration Judge or the BIA." Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 31. DHS referred the request to its component agencies, including ICE, which produced the communications at issue on the present motion for summary judgment. Id. ¶ 32. Initially, ICE produced 587 pages of records consisting primarily of emails from the Office of the Principal Legal Advisor ("OPLA"). Id. ¶ 33. Subsequently, ICE identified over 3,900 additional pages of relevant documents, id. ¶¶ 34-36, and the parties agreed to a schedule according to which ICE would produce 500 pages every two weeks, id. Thus far, ICE has produced approximately 3,400

4

pages. Decl. of Patricia Buchanan dated April 2, 2012 ("Buchanan Decl.") Ex. B ¶¶ 14 & 25.

On January 6, 2012, plaintiffs challenged redactions in a non-exhaustive sample of documents produced by ICE. Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 40. The parties agreed on January 17, 2012 to suspend further productions by ICE until the Court resolved plaintiffs' challenges to the exemptions ICE claimed. Buchanan Decl. ¶ 7. On January 27, 2012, the Government provided plaintiffs with a "Vaughn" index identifying the bases for the challenged redactions. Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 41.

The Vaughn index describes redactions from forty-five documents that ICE has produced. Id. ¶ 43. ICE claims that the deliberative process privilege justifies redactions in thirty of the forty-five documents, that the work-product doctrine justifies redactions in twenty-nine of the documents, and that the attorney-client privilege justifies redactions in fifteen of the documents. Id. Many of the redacted documents contain discussions between OPLA and other government attorneys, both in ICE and in other agencies. For example, in the ninth entry listed in the Vaughn index, ICE redacted "communications between an OPLA and [Department of Justice ('DOJ')] attorney deliberating the agency's legal position and DOJ's legal recommendation regarding the agency's treatment of a removed alien if the alien's case is remanded to continue proceedings." See Buchanan Decl. Ex. E ("Vaughn Index") ¶ 9. In the same document, ICE also redacted "internal OPLA discussions and deliberations regarding the

legality of the agency's position in the context of specific case
facts and case law in preparation of the agency's response to DOJ's
recommendation." Id.

On March 12, 2012, plaintiffs moved for partial summary judgment,
requesting that the Court find that the attorney-client, work-product,
and deliberative-process privileges do not justify ICE's redactions
from the documents in question.[1] On April 2, 2012, the Government
cross-moved for partial summary judgment, requesting that the Court
uphold the assertions of privilege. "Summary judgment is the preferred
procedural vehicle for resolving FOIA disputes." Bloomberg L.P. v. Bd.
of Governors of Federal Reserve Sys., 649 F. Supp. 2d 262, 271
(S.D.N.Y. 2009). Although a party requesting summary judgment must
demonstrate that there is "no genuine dispute as to any material fact"
and that she is "entitled to a judgment as a matter of law," Fed. R.
Civ. P. 56(a), here the parties' disputes "involve purely legal
inquiries, and resolution of those inquiries is not contingent on
resolution of any factual disputes." NAACP Legal Def. & Educ. Fund,
Inc. v. HUD, 2007 WL 4233008, at *1 n.1 (S.D.N.Y. Nov. 30, 2007).
Accordingly, in this context, the Government's Vaughn index functions
as the equivalent of a Rule 56.1 Statement of Undisputed Facts. See
Ferguson v. FBI, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995).

The Government also consented to in camera review of the
documents listed in the Vaughn Index. See Government's Memorandum of

---

[1] Plaintiffs do not, however, challenge certain other privileges that ICE has
invoked with respect to certain of these documents.

Law dated April 2, 2012 at 25. Accordingly, the Court conducted such a review. Based on that review, and the parties' submissions and arguments, the Court hereby grants the plaintiffs' motion, and denies the Government's motion, to the extent described below. The Court further orders the Government to review the documents at issue in light of the Court's opinion and to make appropriate disclosures.

"Upon request, FOIA mandates disclosure of records held by a federal agency, see 5 U.S.C. § 552, unless the documents fall within enumerated exemptions, see § 552(b)." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7 (2001). Specifically, FOIA requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register" and "instructions to staff that affect a member of the public." 5 U.S.C. § 552(a)(2)(B) & (C). By enacting 5 U.S.C. § 522(b)(5), the exemption at issue here, "Congress intended to incorporate into the FOIA all the normal civil discovery privileges." Hopkins v. HUD, 929 F.2d 81, 84 (2d Cir. 1991). The Government has the burden of providing "adequate justification for withholding" information. Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 861 (D.C. Cir. 1980).[2]

---

[2] The Government cites a discussion of the work-product doctrine in Hickman v. Taylor for the proposition that "the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." 329 U.S. 495, 512 (1947). This passage, however, refers to a situation where the applicability of the work-product doctrine to the materials in question has been established, and the adversary is seeking to obtain the documents

To prevail in a FOIA case, agencies "must supply the courts with sufficient information to allow [the courts] to make a reasoned determination that they were correct" in withholding certain materials. Id. When the Government attempts to carry its burden by producing a Vaughn index, that index must provide "information that is not only specific enough to obviate the need for an in camera review, but that also enables the court to review the agency's claimed redactions without having to pull the contextual information out of the redacted documents for itself." Halpern v. FBI, 181 F.3d 279, 294 (2d Cir. 1999). "Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994) (footnote omitted).

The Court turns first to the deliberative-process privilege. "Work product protects 'mental processes of the attorney,' . . . while deliberative process covers 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" Klamath Water, 532 U.S. at 8 (2001) (citations omitted). "To qualify for the deliberative process privilege, a document must be both predecisional and deliberative." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999) (internal quotation marks omitted). In this

---

notwithstanding that applicability. See Coastal States, 617 F.2d at 864-65 (discussing Hickman, but nonetheless requiring the agency to establish that the work-product privilege applies).

context, "predecisional" means that someone participating in the decision-making process prepared the relevant document for the purpose of helping the decisionmakers arrive at a decision. Id. "Deliberative" means that the document relates to the process of formulating policy. Id. To determine whether a document is deliberative, courts examine whether the document "(i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency." Id. (quoting Providence Journal Co. v. U.S. Dep't of the Army, 981 F.2d 552, 559 (1st Cir. 1992)).

In other words, the determination of whether a document is "predecisional" turns on whether the document actually helped officers within an agency make a specific policy decision. In contrast, the determination of whether a document is "deliberative" turns on the document's content, for example, whether it contains considerations of a policy's merits, rather than mere facts or articulations of existing policy, which might also pertain to an agency's decision. "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 151 (1975).

Relying on FOIA's requirement that agencies disclose both "statements of policy and interpretations which have been adopted by the agency" and "instructions to staff that affect a member of the public," 5 U.S.C. § 552(a)(2)(B) & (C), the Supreme Court has

9

distinguished between "opinions and interpretations which embody the agency's effective law and policy," which an agency must disclose, and "papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be," which the privilege protects. <u>Sears</u>, 421 U.S. at 153 (citation and internal quotation marks omitted). Thus, "opinion[s] about the applicability of existing policy to a certain state of facts" and "explanations of agency regulations in specific factual situations" are not "predecisional" because they do not assist officers within an agency with the policy formulation to which the deliberative process privilege applies. <u>Coastal States</u>, 617 F.2d at 868.

Applying these principles, courts have concluded that "[a]n administrative manual which sets forth or clarifies an agency's substantive or procedural law should be made available since there is a legitimate public interest in having those affected guide their conduct in conformance with the agency's understanding." <u>Caplan v. Bureay of Alcohol, Tobacco, & Firearms</u>, 587 F.2d 544, 548 (2d Cir. 1978). Similarly, when the IRS's Office of Chief Counsel ("OCC") issued "Field Service Advice Memoranda" ("FSAs") for field personnel "such as field attorneys, revenue agents, and appeals officers," the deliberative-process privilege did not protect such memoranda because "the structure and purposes of the FSA system reveal that the national office, in issuing these memoranda, is attempting to develop a body of coherent, consistent interpretations of the federal tax laws

nationwide." <u>Tax Analysts v. IRS</u>, 117 F.3d 607, 608-17 (D.C. Cir. 1997).

Here, the Government invokes the deliberative-process privilege to justify redacting such material as "OPLA's internal deliberation regarding the agency's position in response to <u>a specific case</u> raised during [a] meeting." <u>Vaughn</u> Index ¶ 8 (emphasis added); <u>see also</u> <u>id.</u> ¶ 22 (redacting "OPLA's internal deliberations and recommendations regarding the agency's legal position and proposed actions regarding <u>a specific case</u>" (emphasis added)); <u>id.</u> ¶ 23 (same); <u>id.</u> ¶ 26 (same). Such material, which focuses on how existing policy applies to "specific case[s]," is not, however, predecisional, because it consists entirely of "opinion[s] about the applicability of existing policy to a certain state of facts." Indeed, the Government -- without ever identifying when it adopted its general policy of returning deportees who prevail on appeal and restoring their status -- has consistently represented that the core practice has existed for some time. <u>See</u> Directive 11061.1 ¶ 1 (describing "existing ICE policy"). Moreover, as the plaintiffs note, unredacted portions of the relevant documents presume the existence of an applicable policy: "I do appreciate knowing our agency's position on this issue," Plaintiffs' Rule 56.1 Statement of Uncontested Facts Ex. L (corresponding to entry eight in the <u>Vaughn</u> index); "The question posed by OIL is how the alien would be treated if he were to return to the United States following a grant of the PFR and/or remand to the BIA and EOIR for further proceedings," <u>id.</u> Ex. DD (corresponding to entry twenty-six in

11

the Vaughn index). These quotations reinforce the Vaughn index's own
suggestion that the documents in question contain only "opinions and
interpretations which embody the agency's effective law and policy,"
i.e., determinations of how ICE applies its general policies in
specific cases, which are not within the protection of the
deliberative-process privilege.

The Government argues that the deliberative-process privilege
should nonetheless apply for three reasons. First, the Government
argues that documents it has already disclosed to plaintiff reveal
that ICE's operational units, rather than its attorneys, make the
decisions at issue here, i.e., whether to parole back to the United
States deported aliens who have prevailed on appeal and what status to
attribute to an alien upon return. See Buchanan Decl. Exs. H & I
(describing procedures for parole and factors considered by ICE in
making parole decisions). Moreover, the Government asserts that the
Executive Office for Immigration Review ("EOIR"), rather than any
division of ICE, has final authority over what status to attribute to
an alien upon return. Thus, the Government concludes that the
documents at issue here contain only advice from lawyers to those
making decisions that pertain to, but may not fully determine, whether
to return aliens and what status to attribute to them.

This argument, however, cannot overcome the fact that the
decisions described in the documents at issue, regardless of who has
ultimate authority to make them, are not the types of decision to
which the deliberative-process privilege applies, i.e., decisions

12

about the formulation, rather than the application, of policies. See Coastal States, 617 F.2d at 867 ("A strong theme of our opinions has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'"). FOIA requires disclosure of "statements of policy and interpretations which have been adopted by the agency" and "instructions to staff that affect a member of the public," because the public has an undeniable interest in knowing what the law is. "[O]pinion[s] about the applicability of existing policy to a certain state of facts" provide important insights into how those tasked with interpreting a policy, such as the directives identified by ICE, understand its often ambiguous terms. Recognizing that such opinions clarify and augment the laws that they interpret, courts have compelled their disclosure regardless of the decision-making authority of the officials who author them. See Tax Analysts, 117 F.3d at 617 ("The legal conclusions the Office of Chief Counsel provides to field personnel constitute agency law, even if those conclusions are not formally binding."). Such reasoning compels the same result in this case.

Second, the Government argues that the deliberative-process privilege should apply because the documents at issue are informal, rather than formal, articulations of policy. According to the Government, in contrast to formal policy guidance documents such as the directive that ICE has now issued to "describe[ its] existing

policy," the exchanges among ICE attorneys at issue here are informal and do not provide guidance beyond the specific case in which they arise. The Government attempts to distinguish the cases on which plaintiffs rely by noting the formality of the documents that courts ordered agencies to disclose. Compare Tax Analysts, 117 F.3d at 609 ("FSAs . . . ensur[e] that field personnel apply the law correctly and uniformly. . . . [T]hey are held in high regard and are generally followed."), Coastal States, 617 F.2d at 860 ("[I]n some of the offices the documents were indexed by subject matter and used as precedent in later cases."), with Arthur Andersen & Co. v. IRS, 679 F.2d 254, 259 (D.C. Cir. 1982) (refusing to require disclosure of early drafts of a published revenue ruling because such drafts provided no "substantive guidance in future decisions").

The Government's proposed distinction, if accepted, would have the absurd effect of giving the agencies greater protection against FOIA disclosure when they expound their working laws haphazardly than when they follow written directives. The Government does not explain why the public has a diminished interest in knowing that an agency applies its existing policies to specific factual situations in an ad hoc and unguided manner. Indeed, the contrary would seem to be true if the purposes of FOIA are to be achieved. Moreover, the Government's reliance on Arthur Andersen is misplaced. In that case, plaintiffs sought to discover early drafts of a revenue ruling, the final draft of which the IRS had published. Id. The Court declined to disclose the early drafts of the revenue ruling, not because of those drafts'

14

informality, but instead because they articulated "no policy or reason[] . . . not contained in the ruling ultimately published." Id. Here, the Government has not identified any contemporaneous published sources that contain the disputed documents' conclusions about that application of ICE policies to specific circumstances in a more polished form. Because the Government's proposed distinction promotes disorganized decision-making and finds no support in the cases on which the Government relies, the Court rejects it.

Finally, the Government repeatedly suggests in its Vaughn index that the "release of . . . information would adversely impact the free flow of advice and information, reveal the reasoning and deliberative process of agency officials, and therefore, result in a chilling effect on intra-agency communications." Vaughn Index ¶ 3. But this argument proves too much. While the deliberative-process privilege protects agencies from the type of scrutiny that might interfere with policy formulation, see Sears, 421 U.S. at 151, overly broad protection from all scrutiny would frustrate the very purposes of FOIA. "Whenever an agency's actions are opened to public view, the agency exposes itself to pressure and criticism." Tax Analysts, 117 F.3d at 618. Without some account -- not here proffered -- of how disclosure will adversely affect the formulation of policy, rather than the process of interpretation and exposition which constitutes an "agency's effective law and policy," ICE cannot invoke the deliberative-process privilege with respect to the documents in question.

15

The Court turns next to the work-product doctrine. The work-product doctrine serves to protect an attorney's ability to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." Hickman v. Taylor, 329 U.S. 495, 511 (1947). The doctrine or "defeasible privilege" often extends to "correspondence" and "statements" that would reveal an attorney's "mental impressions." Id. Fed. R. Civ. P. 26(b)(3)(A) codifies this doctrine and applies it to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." "In anticipation of litigation" means that a document has "been prepared or obtained because of the prospect of litigation," and specifically "withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation." United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)).

Here, many of the Government's invocations of the work-product doctrine do not specify how the documents in question relate to any ongoing litigation. See, e.g., Vaughn Index ¶ 8 ("The withheld text consists of an OPLA's attorney [sic] opinion regarding the agency's position as well as a copy of internal OPLA meeting minutes reflecting OPLA's deliberation regarding the legal obligations of the agency when an alien is returned after prevailing on a Petition for Review in

16

response a case [sic] brought to the attention of OPLA by an OPLA-OCC."). Similarly, other entries group discussions of how to facilitate a deported alien's return with discussions of the agency's strategy in ongoing removal proceedings, failing to explain how each discussion relates to the other. See, e.g., id. ¶ 16 ("The withheld text consists of communications amongst OPLA attorneys regarding the status of a removed alien upon return to the United States, the legal analysis regarding applicable law to include its effects on the status of a removed alien upon return to the United States and recommendations on how the agency should proceed regarding the return of the removed alien for the purposes of continuing immigration proceedings."); id. ¶ 22 ("The withheld text consists of OPLA communications regarding the legal status of an alien upon parole back to the United States and legal strategy to be taken upon the alien's reentry."). Because the Government has consistently suggested that it has a "process for returning removed aliens," OSG Letter at 4; see also Directive 11061.1 ¶ 1, the Government has not borne its burden of justifying its invocations of the work-product doctrine. As described below, if the Government routinely applies its "process" or "policy" to deported aliens who prevail on appeal, then such applications should occur independently of, and certainly not "because of," the occurrence of further proceedings in an alien's case.

The Government argues that the work-product doctrine should apply to the communications at issue because a deported alien's return necessarily occurs within the context of a removal proceeding. The

17

Government notes that the appellate reversals that trigger ICE's efforts to return removed aliens and to restore their previous statuses also remand the aliens' cases for further proceedings before the EOIR. See INS v. Ventura, 537 U.S. 12, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."). The removal proceedings that occur on remand qualify as litigation, see 8 U.S.C. § 1229a, and OPLA represents the government in such proceedings, see Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 9. Moreover, because an alien's status upon entering the country is frequently a relevant consideration in a removal proceeding before the EOIR, cf. Matadin v. Mukasey, 546 F.3d 85, 90 (2d Cir. 2008),[3] the Government argues that communications about an alien's status upon return necessarily anticipate the removal proceeding.

This argument fails for two reasons. First, the Government's argument does not even address the "because of" litigation standard applied in Adlman. The mere fact that two occurrences share a common cause says nothing about any causal relationship between the two. The mailman's visit may cause me to receive important information and

_____

[3] Matadin addresses the issue of what an alien must show in order to gain admission to the United States. 546 F.3d at 90. Aliens who return after prevailing on an appeal from their removal orders, however, may have left the country only because the Government required them to do so. Since many of these aliens were not seeking admission at the time of their removal, requiring them to seek admission upon their return, and potentially excluding them for failure to meet the requirements for admission, would interfere with the Government's policy of facilitating aliens' return and regarding them "as having reverted to the immigration status" they previously held. Directive 11061.1. The Government does not address this difficulty.

excite my dog, but my dog is not excited <u>because</u> I have received the information. Neither does the fact that the mailman's visit always excites my dog make a causal relationship any likelier. Moreover, as plaintiffs note, the Government's argument would allow agencies to shield from view any remedial measure they undertake in response to an unfavorable appellate ruling simply because the appellate court disposed of the case by remanding it for further proceedings. Because this overbroad argument fails as a matter of logic, it cannot carry the Government's burden.

Second, upon analyzing the relationship between the return of an alien, the restoration of her status, and the continuation of her removal proceeding before the EOIR, the Court finds that the relationship is merely coincidental. As noted above, ICE has for some unspecified amount of time had a "policy" of "facilitat[ing]" a removed alien's return after she prevails on appeal and of "regard[ing] [her] as having reverted to the immigration status . . . she held, if any, prior to the entry of the removal order." Directive 11061.1 ¶¶ 1-2. Nowhere in Directive 11061.1 does ICE indicate that its attorneys' "legal theories" and "strateg[ies]" influence the decision to return an alien.[4] Instead, the policy applies "if either

---

[4] Directive 11061.1 does acknowledge that, unless an appellate court restores an alien's status as a lawful permanent resident, ICE will return the alien only if her "presence is necessary for continued administrative removal proceedings." Directive 11061.1 ¶ 2. Nonetheless, the Government has not argued that the need for an alien's presence at removal proceedings depends on privileged information about ICE's legal theories. Indeed, as only one party to the removal proceeding, ICE cannot determine whether an alien's presence is required.

the [appellate] court's decision restores the alien to lawful
permanent resident (LPR) status, or the alien's presence is necessary
for continued administrative removal proceedings." Id. ¶ 2. Thus, put
simply, revealing how ICE returns a deported alien and restores her
status need not divulge what ICE's work-product doctrine protects,
namely, ICE's legal strategies in that alien's future removal
proceedings. Indeed, even if one were to assume arguendo that an
alien's status upon return affects her removal proceeding, the work-
product privilege still would not apply, because ICE's policy
specifies exactly what status the alien will have upon return: "the
immigration status he or she held, if any, prior to the entry of the
removal order." Id. Accordingly, ICE's participation in ongoing
removal proceedings simply coincides with its implementation of the
policy described in Directive 11061.1, and ICE cannot invoke the work-
product privilege with respect to communications that merely describe
the implementation of its policy.

The Court turns finally to the attorney-client privilege. "The
attorney-client privilege protects confidential communications between
client and counsel made for the purpose of obtaining or providing
legal assistance. . . . . Its purpose is to encourage attorneys and
their clients to communicate fully and frankly . . . ." In re County
of Erie, 473 F.3d 413, 418 (2d Cir. 2007) (citation omitted). "In
civil suits between private litigants and government agencies, the
attorney-client privilege protects most confidential communications
between government counsel and their clients that are made for the

purpose of obtaining or providing legal assistance." Id. "A party
invoking the attorney-client privilege must show (1) a communication
between client and counsel that (2) was intended to be and was in fact
kept confidential, and (3) was made for the purpose of obtaining or
providing legal advice." Id. at 419.

Where officials within an agency seek legal advice from the
agency's attorneys in response to an inquiry from a third party, the
officials are the relevant client, and a court must analyze whether
communications contain "confidential information concerning the
Agency," as opposed to the third party. Schlefer v. United States, 702
F.2d 233, 245 (D.C. Cir. 1983) (emphasis retained). As the Court has
previously noted, "FOIA prohibits agencies from treating their
policies as private information." Nat'l Immigration Project v. Dep't
of Homeland Sec., 2012 WL 375515, at *7 n.10 (S.D.N.Y. Feb. 7, 2012).
Applying these principles, the D.C. Circuit has held that "Chief
Counsel Opinions" ("CCOs") that "address questions of Agency policy"
in response to applications by outsiders are not protected by the
attorney-client privilege because the "factual information contained
in the CCOs . . . is not provided by the 'client' . . . but by a third
party." Schlefer, 702 F.2d at 235, 245.

Here, the Government cannot invoke the attorney-client privilege
because it has failed to identify any confidential information
"concerning the Agency" that ICE officials communicated. The
Government claims that, because "OPLA provides legal advice to . . .
all OPLA-OCCs as well as to an among the various legal divisions

21

within OPLA," "requests for legal advice and recommendations from
OPLA-OCCs to OPLA . . . are attorney client privileged
communications." <u>Vaughn</u> Index ¶ 3. Based on its assumption that all
"requests for legal advice" are privileged, the Government asserts
that the attorney-client privilege protects legal advice concerning "a
press inquiry regarding the legal obligations of the agency to return
an LPR when the LPR prevails on a judicial ruling subsequent to
removal." <u>Id.</u> ¶ 5. Similarly, the Government asserts that the
attorney-client privilege protects legal advice concerning "the
agency's response to the alien's attorney's request to return the
removed alien to the United States while the alien's appeal was
pending." <u>Id.</u> ¶ 23.

     Such communications contain no confidential information
"concerning the Agency." In the communications described, ICE merely
applies its policies and its interpretations of applicable statutes to
requests supplied by third parties. As in <u>Schlefer</u>, "when the official
transmits the relevant facts to the Chief Counsel, no new or
confidential information concerning the Agency is imparted." 702 F.2d
at 245.

     The Government offers three bases for distinguishing <u>Schlefer</u>.
First, it argues once again that the EOIR has the authority to render
final decisions and that the documents in questions contain only
informal analyses. However, an attorney's authority and formality are
irrelevant to the determination of whether a client communicates
confidential information. <u>Id.</u> at 244-45. Second, the Government

contends that, unlike the CCOs in Schlefer, the documents at issue in this case were not widely distributed within the agency. But even a showing that ICE kept documents confidential by restricting their distribution cannot relieve the Government of its burden of showing that the documents initially contained confidential information. Finally, the Government argues that it has already disclosed the facts that outsiders communicated to ICE. Nonetheless, such disclosure does not discharge the Government's obligation. As in Schlefer, the Government must also reveal ICE's analyses of how its policies -- which are not confidential information -- applied to those facts. Accordingly, under Schlefer, the Government's invocation of the attorney-client privilege fails.

Finding fault with the Government's invocation of each of the privileges recognized under 5 U.S.C. § 522(b)(5), the Court undertook its own in camera review of a sample of the documents in question. Based on its in camera review of those documents, the Court concludes that, applying the principles discussed above, the Government has asserted the deliberative-process, work-product, and attorney-client privileges too broadly. Rather than review the hundreds of pages at issue to specify exactly what the Government must disclose, however, the Court orders the Government to reexamine these documents, as well as the documents yet to be produced, and to make disclosures according to the principles described in this opinion. See transcript of related oral argument dated 6/18/12 at 9:11-25.

In the absence of any further applications, the Government is directed to disclose these portions to plaintiffs by no later than August 31, 2012. In the meantime, the Court will file under seal a complete copy of the entire set of documents that it reviewed in camera. The Clerk of the Court is ordered to close documents number 35, 38, and 39 on the docket of this case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       June 15, 2012

24