# Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

_____

*86 Chambers Street, 3rd floor*
*New York, New York 10007*

April 24, 2012

**<u>BY EMAIL</u>**

Nancy Morawetz, Esq.
Washington Square Legal Services, Inc.
245 Sullivan Street, 5th Floor
New York, New York 10012

       Re:   *<u>NLG et al. v. DHS et al.,</u> No. 11 Civ. 3235 (JSR)*

Dear Ms. Morawetz:

     As discussed, we attach documents that are the subject of Judge Rakoff's orders dated February 7 and February 24, 2012.  This release includes redactions reflecting the privacy exemptions that are covered by the current stay, and that are subject to further order from the Court.

     The Government has determined not to appeal the district court's orders and has further determined, in its discretion, not to redact certain portions of these documents notwithstanding Judge Rakoff's ruling that we are entitled to do so.  This discretionary release of portions of the documents in addition to those required to be released does not constitute a waiver of the Government's entitlement to withhold some or all of any other document.  *See Mobil Oil Corp. v. EPA*, 879 F.2d 698, 701 (9th Cir. 1989) (surveying law and concluding that generally "the release of certain documents waives FOIA exemptions *only for those documents released*") (emphasis in original); *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835-36 (D.C. Cir. 2001) ("releasing some photographs" does not mean Government has waived right to withhold other photographs); *Stein v. DOJ*, 662 F.2d 1245, 1259 (7th Cir. 1981) (discretionary release should waive no right to withhold records of "similar nature").  The Government hereby reserves all privileges, rights and defenses with respect to any additional documents and information that may be responsive to requests in this FOIA litigation or in any other matter.

Nancy Morawetz, Esq.
April 24, 2012
Page 2

Sincerely,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:     /s/
        PATRICIA L. BUCHANAN
        Assistant United States Attorney
        Tel.     (212) 637-3274
        Fax     (212) 637-2786

# Exhibit A1

## Saharsky, Nicole A (SMO)

**From:**    Saharsky, Nicole A
**Sent:**    Thursday, January 08, 2009 10:56 AM
**To:**    Kneedler, Edwin S
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR- NKEN specifically

FYI - re: your question on whether DHS arranges for the return of the alien on any remand (as opposed to success on the merits)

---

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Thursday, January 08, 2009 10:40 AM
**To:** Saharsky, Nicole A
**Cc:** Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR- NKEN specifically

Nicole,
DHS response below. It appears there are circumstances under which DHS would not be willing to parole Nken back into the United States.

---

**From:** [b]{2} & (b){6} @dhs.gov]
**Sent:** Wednesday, January 07, 2009 12:29 PM
**To:** Neiman-Kelting, Melissa (CIV); (b){2} & (b){6}
**Cc:** (b){2} & (b){6} (DHS); (b){2} & (b){6} (DHS); (b){2} & (b){6}
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

Melissa,

(b){2} & (b){6} can elaborate, but the short answer is yes.

It depends on the reason the case went back to the BIA. If it goes back on a matter that should be resolved by the BIA itself, e.g. it did not consider an argument in the alien's brief, or there was a procedural snafu, we probably would not parole the alien back.

Moreover, in this case Nken filed a PFR of a MTR denial (number 3 at that) rather than a direct appeal. Unless/until Nken gets his case re-opened, he can be removed; and unless the BIA had granted him a stay, ICE could have removed him while the MTR was pending before the BIA prior to denial, which would the same situation after a remand by the circuit court following a PFR. In this particular case, while it depends on the reasons the PFR gets granted, it's possible we would not contemplate return absent re-opening.

(b){2} & (b){6}

---

**From:** Neiman-Kelting, Melissa (CIV) [(b){2} & (b){6} @usdoj.gov]
**Sent:** Wednesday, January 07, 2009 12:11 PM
**To:** (b){2} & (b){6}
**Cc:** (b){2} & (b){6} Neiman-Kelting, Melissa (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

(b){2} & (b){6}

OSG would like me to confirm that if Nken succeeds on his petition for review before the Fourth Circuit and the case is remanded to the Board, DHS will parole him back in whether or not the remand provides for a new hearing before the IJ (at which he would be entitled to appear). Put another way, is there any circumstance under

which Nken would succeed on his PFR, have his case remanded to the Board, but DHS would be unwilling to parole him back into the US?

Thank you,
Melissa

---

**From:** (b)(2) & (b)(6) ███████████@dhs.gov]
**Sent:** Monday, January 05, 2009 6:32 PM
**To:** Saharsky, Nicole A; Neiman-Kelting, Melissa (CIV); (b)(2) & (b)(6) ███████████ (DHS); (b)(2) & (b)(6) ████ (DHS); (b)(2) & (b)(6) ████
**Cc:** Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

I think we're ok with removal of the language.  But, this is more because the practice can be a bit confusing because it's based upon the status of the alien at the time of the removal.  For example, an alien who was an overstay seeking asylum who is removed, and then returned, doesn't have a status to revert to, so would be in effect in a parole status (although for practical purposes the removal proceedings would continue with the alien as charged originally).  But, if an alien were in LPR status, and the basis for loss of the LPR status was the removal order which is subsequently vacated by a PFR grant, then the alien would, in essence, be returned to that LPR status upon his return.  In Leocal, Lisa indicated that we helped facilitate the alien's return by giving him a boarding letter, though, and did not send him his green card in Haiti.

---

**From:** Saharsky, Nicole A [(b)(2) & (b)(6) ███████████@usdoj.gov]
**Sent:** Monday, January 05, 2009 5:54 PM
**To:** Neiman-Kelting, Melissa (CIV); (b)(2) & (b)(6) ███████████████████████
**Cc:** Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

Just as a follow up, if DHS is comfortable with the "status they had at the time" language and we can be more concrete/provide a citation, we'll leave it in.  But we don't want to open ourselves up to trouble.

---

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Monday, January 05, 2009 5:47 PM
**To:** (b)(2) & (b)(6) ████████████ (DHS); (b)(2) & (b)(6) ██████ (DHS); (b)(2) & (b)(6) ████
**Cc:** Saharsky, Nicole A; Keener, Donald (CIV); Neiman-Kelting, Melissa (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR
**Importance:** High

We have a question about the language in bold/italics (around page 41):

"By policy and practice, the government accords aliens, who were removed pending judicial review but then prevailed before the courts, effective relief by, *inter alia*, facilitating the aliens' return to the United States **and according them the status they had at the time of removal.** See 8 U.S.C. 1182(d)(5). Amici hypothesize a number of instances in which aliens could be harmed in their home countries while awaiting judicial review, but application of the Section 1252(f)(2) standard readily accommodates stays in those extraordinary cases. If an alien can demonstrate that he actually will be persecuted or tortured if removed to his home country, removal would be "prohibited as a matter of law" under the INA's withholding of removal provision, 8 U.S.C. 1231, and the CAT. There are, therefore, no "grave and doubtful" Suspension Clause concerns, *Jones* v. *United States*, 526 U.S. 227, 239 (1999), that mandate the choice of one stay standard over another."

Unless we can provide a more concrete explanation of what it means to return someone to "the status they had at

the time of removal" and provide citations in support, OSG would prefer to remove this language and simply state that the aliens can return via parole with a citation to 8 U.S.C. 1182(d)(5).

Please let me know ASAP if DHS has any objection to this deletion.

Many thanks,

Melissa

**From:** (b)(2) & (b)(6) @dhs.gov]
**Sent:** Friday, January 02, 2009 2:13 PM
**To:** Neiman-Kelting, Melissa (CIV)
**Cc:** (b)(2) & (b)(6) Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

I don't have Ed's email address, so can't cc:him.

There is not a large volume of these cases, and we generally handle them on a by-request basis. But, anytime the BIA decision is vacated, I would believe the alien could ask to come back to the US to have the former status restored. It should be noted that most of these cases involve criminal aliens. We return the alien to the custody situation from which the alien was removed. There have been several cases I've been involved in where the alien opts to reside outside the US to continue proceedings.

**From:** Neiman-Kelting, Melissa (CIV) (b)(2) & (b)(6) @usdoj.gov]
**Sent:** Friday, January 02, 2009 1:47 PM
**To:** (b)(2) & (b)(6)
**Cc:** (b)(2) & (b)(6) Keener, Donald (CIV); Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

(b)(2) & (b)(6)
Please see Nicole's follow-up inquiry.

**From:** Saharsky, Nicole A
**Sent:** Friday, January 02, 2009 1:40 PM
**To:** Neiman-Kelting, Melissa (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

Can you ask DHS if this process is followed if the case gets remanded back to the BIA, or only if the court of appeals grants relief outright? Please cc Ed on the response.

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Friday, January 02, 2009 7:24 AM
**To:** Saharsky, Nicole A
**Cc:** Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

Nicole,
Per the comments we sent over on Monday, I sent DHS an email requesting information on how an alien returns to the US if he is removed during the adjudication of his PFR and is ultimately successful. The response is below.

**From:** (b)(2) & (b)(6) @dhs.gov]

**Sent:** Wednesday, December 31, 2008 5:13 PM
**To:** Neiman-Kelting, Melissa (CIV); (b)(2) & (b)(6)
**Cc:** Keener, Donald (CIV); (b)(2) & (b)(6)    (CIV); (b)(2) & (b)(6) (CIV); (b)(2) & (b)(6)
**Subject:** RE: NKEN- request for information

On the other question of how we handle aliens who have been removed while a PFR is pending, the consensus is that the alien is paroled back in.  Here's the comment I got back from ELD, but I also checked with CBP and they concur with this process.

As we all know there is no statute that directly addresses the issue, and given that CBP will not simply let the person pass through inspection based upon the pfr grant, we have relied on parole under section 212(d)(5).  I don't believe that ICE has established a "procedure" per se, but has handled them on a case by case basis.  The process is generally that ICE grants the parole and sends a cable to the consulate or embassy nearest to the alien with instructions to issue a travel document/boarding letter to the alien.  The alien must supply his/her own transportation to the U.S., and if the alien was in detention prior to deportation, the alien is returned to detention upon arrival at the POE.

# Exhibit A2

**Saharsky, Nicole A (OSG)**

| | |
|---|---|
| **From:** | Saharsky, Nicole A |
| **Sent:** | Friday, January 02, 2009 1:31 PM |
| **To:** | Kneedler, Edwin S |
| **Subject:** | FW: NKEN- request for information- reentry of aliens with successful PFR |

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Friday, January 02, 2009 7:24 AM
**To:** Saharsky, Nicole A
**Cc:** Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

Nicole,
Per the comments we sent over on Monday, I sent DHS an email requesting information on how an alien returns to the US if he is removed during the adjudication of his PFR and is ultimately successful. The response is below.

**From:** (b)(2) & (b)(6)          @dhs.gov]
**Sent:** Wednesday, December 31, 2008 5:13 PM
**To:** Neiman-Kelting, Melissa (CIV); (b)(2) & (b)(6)
**Cc:** Keener, Donald (CIV); (b)(2) & (b)(6) (CIV); (b)(2) & (b)(6) (CIV); (b)(2) & (b)(6)
**Subject:** RE: NKEN- request for information

On the other question of how we handle aliens who have been removed while a PFR is pending, the consensus is that the alien is paroled back in. Here's the comment I got back from ELD, but I also checked with CBP and they concur with this process.

As we all know there is no statute that directly addresses the issue, and given that CBP will not simply let the person pass through inspection based upon the pfr grant, we have relied on parole under section 212(d)(5). I don't believe that ICE has established a "procedure" per se, but has handled them on a case by case basis. The process is generally that ICE grants the parole and sends a cable to the consulate or embassy nearest to the alien with instructions to issue a travel document/boarding letter to the alien. The alien must supply his/her own transportation to the U.S., and if the alien was in detention prior to deportation, the alien is returned to detention upon arrival at the POE.

1

## Saharsky, Nicole A (OSG)

| | |
|---|---|
| **From:** | Neiman-Kelting, Melissa (CIV) |
| **Sent:** | Friday, January 02, 2009 2:29 PM |
| **To:** | Saharsky, Nicole A; Kneedler, Edwin S |
| **Cc:** | Neiman-Kelting, Melissa (CIV); Keener, Donald (CIV) |
| **Subject:** | FW: NKEN- request for information- reentry of aliens with successful PFR |

Nicole and Ed,
Here is DHS' response. It appears that the process is followed in any case where a successful petitioner wants to return to the US, not limited to cases where the court grants relief outright.

Melissa

**From:** (b)(2) & (b)(6)                    @dhs.gov]
**Sent:** Friday, January 02, 2009 2:13 PM
**To:** Neiman-Kelting, Melissa (CIV)
**Cc:** (b)(2) & (b)(6)          Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

I don't have Ed's email address, so can't cc him.

There is not a large volume of these cases, and we generally handle them on a by-request basis. But, anytime the BIA decision is vacated, I would believe the alien could ask to come back to the US to have the former status restored. It should be noted that most of these cases involve criminal aliens. We return the alien to the custody situation from which the alien was removed. There have been several cases I've been involved in where the alien opts to reside outside the US to continue proceedings.

**From:** Neiman-Kelting, Melissa (CIV) (b)(2) & (b)(6)              @usdoj.gov]
**Sent:** Friday, January 02, 2009 1:47 PM
**To:** (b)(2) & (b)(6)
**Cc:** (b)(2) & (b)(6)    Keener, Donald (CIV); Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

(b)(2) & (b)(6)
Please see Nicole's follow-up inquiry.

**From:** Saharsky, Nicole A
**Sent:** Friday, January 02, 2009 1:40 PM
**To:** Neiman-Kelting, Melissa (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

Can you ask DHS if this process is followed if the case gets remanded back to the BIA, or only if the court of appeals grants relief outright? Please cc Ed on the response.

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Friday, January 02, 2009 7:24 AM
**To:** Saharsky, Nicole A
**Cc:** Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

Nicole,

Per the comments we sent over on Monday, I sent DHS an email requesting information on how an alien returns to the US if he is removed during the adjudication of his PFR and is ultimately successful.  The response is below.

**From:** █(b)(2) & (b)(6)█ @dhs.gov]
**Sent:** Wednesday, December 31, 2008 5:13 PM
**To:** Neiman-Kelting, Melissa (CIV); █(b)(2) & (b)(6)█
**Cc:** Keener, Donald (CIV); █(b)(2) & (b)(6)█ (CIV); █(b)(2) & (b)(6)█ (CIV); █(b)(2) & (b)(6)█
**Subject:** RE: NKEN- request for information

On the other question of how we handle aliens who have been removed while a PFR is pending, the consensus is that the alien is paroled back in.  Here's the comment I got back from ELD, but I also checked with CBP and they concur with this process.

As we all know there is no statute that directly addresses the issue, and given that CBP will not simply let the person pass through inspection based upon the pfr grant, we have relied on parole under section 212(d)(5).  I don't believe that ICE has established a "procedure" per se, but has handled them on a case by case basis.  The process is generally that ICE grants the parole and sends a cable to the consulate or embassy nearest to the alien with instructions to issue a travel document/boarding letter to the alien.  The alien must supply his/her own transportation to the U.S., and if the alien was in detention prior to deportation, the alien is returned to detention upon arrival at the POE.

3

**Kneedler, Edwin S (OSG)**

| | |
|---|---|
| **From:** | Saharsky, Nicole A |
| **Sent:** | Monday, January 05, 2009 6:44 PM |
| **To:** | Kneedler, Edwin S |
| **Subject:** | FW: NKEN- request for information- reentry of aliens with successful PFR |

I think we need to try to rework this language.  I am concerned that just saying parole doesn't really encompass what we do.

**From:** ██(b)(2) & (b)(6)██████████dhs.gov]
**Sent:** Monday, January 05, 2009 6:32 PM
**To:** Saharsky, Nicole A; Neiman-Kelting, Melissa (CIV); ██(b)(2) & (b)(6)██████ (DHS)██(b)(2) & (b)(6)██ (DHS); ██(b)(2) & (b)(6)██
**Cc:** Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

I think we're ok with removal of the language.  But, this is more because the practice can be a bit confusing because it's based upon the status of the alien at the time of the removal.  For example, an alien who was an overstay seeking asylum who is removed, and then returned, doesn't have a status to revert to, so would be in effect in a parole status (although for practical purposes the removal proceedings would continue with the alien as charged originally).  But, if an alien were in LPR status, and the basis for loss of the LPR status was the removal order which is subsequently vacated by a PFR grant, then the alien would, in essence, be returned to that LPR status upon his return.  In Leocal, Lisa indicated that we helped facilitate the alien's return by giving him a boarding letter, though, and did not send him his green card in Haiti.

**From:** Saharsky, Nicole A ██(b)(2) & (b)(6)██████@usdoj.gov]
**Sent:** Monday, January 05, 2009 5:54 PM
**To:** Neiman-Kelting, Melissa (CIV); ████████ ██(b)(2) & (b)(6)████████████
**Cc:** Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

Just as a follow up, if DHS is comfortable with the "status they had at the time" language and we can be more concrete/provide a citation, we'll leave it in.  But we don't want to open ourselves up to trouble.

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Monday, January 05, 2009 5:47 PM
**To:** ██(b)(2) & (b)(6)███████████ (DHS); ██(b)(2) & (b)██ (DHS); ██(b)(2) & (b)(6)██
**Cc:** Saharsky, Nicole A; Keener, Donald (CIV); Neiman-Kelting, Melissa (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR
**Importance:** High

We have a question about the language in bold/italics (around page 41):

"By policy and practice, the government accords aliens, who were removed pending judicial review but then prevailed before the courts, effective relief by, *inter alia*, facilitating the aliens' return to the United States *and according them the status they had at the time of removal.* See 8 U.S.C. 1182(d)(5). Amici hypothesize a number of instances in which aliens could be harmed in their home countries while awaiting judicial review, but application of the Section 1252(f)(2) standard readily accommodates stays in those extraordinary cases. If an alien can demonstrate that he actually will be persecuted or tortured if removed to his home country, removal would be "prohibited as a matter of law" under the INA's withholding of removal provision, 8 U.S.C. 1231, and the CAT. There are, therefore, no "grave and doubtful" Suspension

4

Clause concerns, *Jones* v. *United States*, 526 U.S. 227, 239 (1999), that mandate the choice of one stay standard over another."

Unless we can provide a more concrete explanation of what it means to return someone to "the status they had at the time of removal" and provide citations in support, OSG would prefer to remove this language and simply state that the aliens can return via parole with a citation to 8 U.S.C. 1182(d)(5).

Please let me know ASAP if DHS has any objection to this deletion.

Many thanks,

Melissa

---

**From:** ▇▇▇▇▇▇ (b)(2) & (b)(6) @dhs.gov]
**Sent:** Friday, January 02, 2009 2:13 PM
**To:** Neiman-Kelting, Melissa (CIV)
**Cc:** (b)(2) & (b)(6) Keener, Donald (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

I don't have Ed's email address, so can't cc:him.

There is not a large volume of these cases, and we generally handle them on a by-request basis. But, anytime the BIA decision is vacated, I would believe the alien could ask to come back to the US to have the former status restored. It should be noted that most of these cases involve criminal aliens. We return the alien to the custody situation from which the alien was removed. There have been several cases I've been involved in where the alien opts to reside outside the US to continue proceedings.

---

**From:** Neiman-Kelting, Melissa (CIV) (b)(2) & (b)(6) @usdoj.gov]
**Sent:** Friday, January 02, 2009 1:47 PM
**To:** (b)(2) & (b)(6)
**Cc:** (b)(2) & (b)(6) Keener, Donald (CIV); Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

(b)(2) & (b)(6)

Please see Nicole's follow-up inquiry.

---

**From:** Saharsky, Nicole A
**Sent:** Friday, January 02, 2009 1:40 PM
**To:** Neiman-Kelting, Melissa (CIV)
**Subject:** RE: NKEN- request for information- reentry of aliens with successful PFR

Can you ask DHS if this process is followed if the case gets remanded back to the BIA, or only if the court of appeals grants relief outright? Please cc Ed on the response.

---

**From:** Neiman-Kelting, Melissa (CIV)
**Sent:** Friday, January 02, 2009 7:24 AM
**To:** Saharsky, Nicole A
**Cc:** Neiman-Kelting, Melissa (CIV)
**Subject:** FW: NKEN- request for information- reentry of aliens with successful PFR

Nicole,
Per the comments we sent over on Monday, I sent DHS an email requesting information on how an alien returns to the US if he is removed during the adjudication of his PFR and is ultimately successful. The response is below.

2

5

**From:** (b)(2) & (b)(6)                               @dhs.gov]
**Sent:** Wednesday, December 31, 2008 5:13 PM
**To:** Neiman-Kelting, Melissa (CIV); (b)(2) & (b)(6)
**Cc:** Keener, Donald (CIV); (b)(2) & (b)(6)    (CIV); (b)(2) & (b)(6)  (CIV); (b)(2) & (b)(6)
**Subject:** RE: NKEN- request for information

On the other question of how we handle aliens who have been removed while a PFR is pending, the consensus is that the alien is paroled back in. Here's the comment I got back from ELD, but I also checked with CBP and they concur with this process.

As we all know there is no statute that directly addresses the issue, and given that CBP will not simply let the person pass through inspection based upon the pfr grant, we have relied on parole under section 212(d)(5). I don't believe that ICE has established a "procedure" per se, but has handled them on a case by case basis. The process is generally that ICE grants the parole and sends a cable to the consulate or embassy nearest to the alien with instructions to issue a travel document/boarding letter to the alien. The alien must supply his/her own transportation to the U.S., and if the alien was in detention prior to deportation, the alien is returned to detention upon arrival at the POE.

3

6

**Kneedler, Edwin S (OSG)**

| | |
|---|---|
| **From:** | Saharsky, Nicole A |
| **Sent:** | Tuesday, January 06, 2009 11:19 AM |
| **To:** | (b)(2) & (b)(6) (DHS); (b)(2) & (b)(6) |
| **Cc:** | (b)(2) & (b)(6)                    ; Kneedler, Edwin S; Neiman-Kelting, Melissa (CIV) |
| **Subject:** | FW: DHS chart for Nken |

DHS folks:

The AILA amicus brief cites (page 8 note 7) a number of cases in which the Eleventh Circuit has denied a stay but granted relief on the merits to the alien. A chart summarizing these cases is attached. For each of them, could you let us know (a) whether the alien actually was removed; (b) if so, if/how DHS let them return to the United States; and (c) what was the ultimate disposition of the case? The amicus brief states that one alien who prevailed in the 11th Circuit was actually removed after his stay was denied (Alzate-Zuleta), but does not indicate whether he was returned to the U.S. The amicus brief also states that petitioners in the Toska case were ultimately granted asylum after the 11th Cir. remand. Hopefully DHS can verify these as well as provide information on the other cases. Ed would like to have this information as he prepares for oral argument.

Thanks,
Nicole



Chart for DHS in
Nken.wpd

1

7

Nken v. Mukasey Chart for DHS

| Case Name/ Alien Name | Stay of Removal Granted or Denied? | Was Alien Removed After Stay Denied? | 11th Circuit's Decision | Involve Asylum Claim? | Ultimate Dispositio n/Was Alien Returned to U.S. if previously removed? |
|---|---|---|---|---|---|
| Sergio Omar Beldorati (A97-927-591) | Denied on 1/9/2007 | ??? | Remand to BIA to determine whether alien suffered past persecution (was not addressed by IJ/BIA); See 228 Fed. Appx. 952 (11th Cir. June 21, 2007) | Yes (seeking asylum from Argentina) | ??? |
| Edi Saliaj (A77-636-927) | Denied on 9/14/2006 | ??? | Remand to IJ to determine whether alien suffered past persecution because IJ did not address that; See 242 Fed. Appx. 642 (11th Cir. June 20, 2007) | Yes (seeking asylum from Albania) | ??? |

| | | | | | |
|---|---|---|---|---|---|
| Diana Toska, Gezim Toska, Klevis Toska, Anxhelina Toska (A77-253-077) | Denied on 2/24/2006 | ??? | Remand to BIA to reconsider credibility determination because IJ and BIA failed to consider corroborating evidence in first instance; See 194 Fed. Appx. 767 (11th Cir. Sept. 6, 2006) | Yes (seeking asylum from (b)(6)) | Amicus Brief states that petitioners ultimately granted asylum on June 9, 2008; ??? |
| Carlos Augusto Alzate-Zuleta, Francy Trujillo, Julian David Alzate, Carlos Augusto Alzate-Trujillo, Natalia Alzate (A95-255-313) | Denied on 10/26/2006 | Amicus brief states that petitioner was removed after stay was denied ??? | Vacate and remand after finding that evidence compelled conclusion that petitioners suffered past persecution; remand to see if government can rebut presumption of future persecution; See 238 Fed. Appx. 472 (June 22, 2007) | Yes (seeking asylum from Colombia) | ??? |
| Tijan Masire Camara (A79-059-207) | Denied on 9/7/2006 | ??? | Vacated and remanded to BIA after government filed motion to remand to BIA | ??? | ??? |

9

| Al Hafiz Jivan (A98-498-409) | Granted on 2/4/2008 "in light of the governme nt's notice of non-opposition " | ??? | Vacate and remand to BIA with directions to remand to IJ | No | ??? |

**Kneedler, Edwin S (OSG)**

| | |
|---|---|
| **From:** | [b)(2) & (b)(6)] @dhs.gov] |
| **Sent:** | Tuesday, January 06, 2009 5:19 PM |
| **To:** | Saharsky, Nicole A; [b)(2) & (b)(6)] (DHS); [b)(2) & (b)(6)] |
| **Cc:** | [b)(2) & (b)(6)] Kneedler, Edwin S; Neiman-Kelting, Melissa (CIV); [b)(2) & (b)(6)] |
| | [b)(2) & (b)(6)] |
| **Subject:** | RE: DHS chart for Nken |
| **Attachments:** | Chart for DHS in Nken-apld (3).doc |

Nicole,

Attached please find revised chart with most of the information filled in. We're still tracking down the outcome in Saliaj. The aliens in 3 of the 6 cases were removed. Of those 3: in 1 agency couldn't track down respondent or his counsel; in a 2nd DRO is working to return the aliens to the U.S.; in the 3rd -- Camara - the alien ultimately [b)(6)]. Camara presents an unusual scenario in that he was removed to a 3rd country, [b)(6)], other than the one at issue in his [b)(6)]. Such 3rd country removals are rare.

Please let us know if you have any questions.



| | |
|---|---|
| **From:** | Saharsky, Nicole A [b)(2) & (b)(6)] @usdoj.gov] |
| **Sent:** | Tuesday, January 06, 2009 11:19 AM |
| **To:** | [b)(2) & (b)(6)] |
| **Cc:** | [b)(2) & (b)(6)] ; Kneedler, Edwin S; Neiman-Kelting, Melissa (CIV) |
| **Subject:** | FW: DHS chart for Nken |

DHS folks:

The AILA amicus brief cites (page 8 note 7) a number of cases in which the Eleventh Circuit has denied a stay but granted relief on the merits to the alien. A chart summarizing these cases is attached. For each of them, could you let us know (a) whether the alien actually was removed; (b) if so, if/how DHS let them return to the United States; and (c ) what was the ultimate disposition of the case? The amicus brief states that one alien who prevailed in the 11th Circuit was actually removed after his stay was denied (Alzate-Zuleta), but does not indicate whether he was returned to the U.S. The amicus brief also states that petitioners in the Toska case were [b)(6)] after the 11th Cir. remand. Hopefully DHS can verify these as well as provide information on the other cases. Ed would like to have this information as he prepares for oral argument.

Thanks,
Nicole

<<Chart for DHS in Nken.wpd>>

1

11

Nken v. Mukasey Chart for DHS

| Case Name/ Alien Name | Stay of Removal Granted or Denied? | Was Alien Removed After Stay Denied? | 11th Circuit's Decision | Involve Asylum Claim? | Ultimate Disposition/Was Alien Returned to U.S. if previously removed? |
|---|---|---|---|---|---|
| Sergio Omar Beldorati (A97-927-591) | Denied on 1/9/2007 | VWPP removal to Argentina on 1/24/2007 (11th Cir. notified in advance of imminent removal) | Remand to BIA to determine whether alien suffered past persecution (was not addressed by IJ/BIA); See 228 Fed. Appx. 952 (11th Cir. June 21, 2007) | Asylum denied as untimely. Seeking W/H under INA § 241(b)(3) from Argentina. [As a VWPP violator he was in "asylum only" proceedings.] | 3/10/2008: BIA remand to IJ. 7/16/2008: ███████ (b)(6) █████████████ |
| Edi Saliaj (A77-636-927) | Denied on 9/14/2006 | Not removed. (Saliaj was previously removed on 9/21/2000 and tried to re-enter in 2002, leading to the instant case.) | Remand to IJ to determine whether alien suffered past persecution because IJ did not address that; See 242 Fed. Appx. 642 (11th Cir. June 20, 2007) | Yes (seeking asylum from Albania) [ER/credible fear referral] | 2/29/2008: BIA remand to IJ. 12/9/2008: hearing???? [need to check with OCC MIA to find out status] |
| Diana Toska, Gezim Toska, Klevis Toska, Anxhelina Toska (A77-253-077) | Denied on 2/24/2006 | Not removed. I-166 surrender letter sent on 2/27/2006, but alien did not show. | Remand to BIA to reconsider credibility determination because IJ and BIA failed to consider corroborating evidence in first instance; See 194 Fed. Appx. 767 (11th Cir. Sept. 6, 2006 | Yes (seeking asylum from Albania) | 4/27/2007: BIA remand to IJ. (b)(6) ████████████████ |

| | | | | | |
|---|---|---|---|---|---|
| Carlos Augusto Alzate-Zuleta, Francy Trujillo, Julian David Alzate, Carlos Augusto Alzate-Trujillo, Natalia Alzate (A95-255-313) | Denied on 10/26/2006 | Petitioner and his two sons removed after stay was denied.<br><br>10/12/2006: arrested by FugOps. 11/9/2006: removed. | Vacate and remand after finding that evidence compelled conclusion that petitioners suffered past persecution; remand to see if government can rebut presumption of future persecution; See 238 Fed. Appx. 472 (June 22, 2007) | Yes (seeking asylum from Colombia) | 10/15/2007: BIA remand to IJ. Mother and daughter in the U.S.; DRO to pick-up and bring back Petitioner and sons. Next hearing: 5/21/2009. |
| Tijan Masire Camara (A79-059-207) | Denied on 9/7/2006 | 9/12/2006: reported per surrender letter. Returned with passport and plane ticket, as requested. Removed to (b)(6) ██████ | Vacated and remanded to BIA after government filed motion to remand to BIA | (b)(6) ████████<br><br>(b)(6) ████████ | 6/21/2007: BIA remand to IJ. (b)(6) ██████████ |
| Al Hafiz Jivan (A98-498-409) | Granted on 2/4/2008 "in light of the government's notice of non-opposition" (VD expired on 2/10/2008) | Not removed. Not in custody (reporting as required). | Vacate and remand to BIA with directions to remand to IJ | No | Circuit Court remand is pending at the BIA (as of 10/6/2008) |

**Kneedler, Edwin S (OSG)**

| | |
|---|---|
| **From:** | (b)(2) & (b)(6) |
| **Sent:** | Friday, January 09, 2009 3:57 PM |
| **To:** | Kneedler, Edwin S; Saharsky, Nicole A |
| **Subject:** | DHS Chart in Nken |

· Hi Ed,

Please find attached the latest "DHS chart" for Nken regarding the cases cited in the AILA amicus brief (page 8 note 7) in which the Eleventh Circuit denied a stay but thereafter granted relief on the merits to the alien. The notable change from the last version that was sent around is that the outcome/disposition of the Sallaj case is now listed.

Have a good weekend!

Thanks,





Chart for DHS in
Nken-1-9-09.d...

1

14

Nken v. Mukasey Chart for DHS

| Case Name/ Alien Name | Stay of Removal Granted or Denied? | Was Alien Removed After Stay Denied? | 11th Circuit's Decision | Involve Asylum Claim? | Ultimate Disposition/Was Alien Returned to U.S. if previously removed? |
|---|---|---|---|---|---|
| Sergio Omar Beldorati (A97-927-591) | Denied on 1/9/2007 | VWPP removal to Argentina on 1/24/2007 (11th Cir. notified in advance of imminent removal) | Remand to BIA to determine whether alien suffered past persecution (was not addressed by IJ/BIA); See 228 Fed. Appx. 952 (11th Cir. June 21, 2007) | Asylum denied as untimely. Seeking W/H under INA § 241(b)(3) from Argentina. [As a VWPP violator he was in "asylum only" proceedings.] | 3/10/2008: BIA remand to IJ. 7/16/2008: ▮▮▮▮▮ (b) (6) |
| Edi Saliaj (A77-636-927) | Denied on 9/14/2006 | Not removed. (Saliaj was previously removed on 9/21/2000 and tried to re-enter in 2002, leading to the instant case.) | Remand to IJ to determine whether alien suffered past persecution because IJ did not address that; See 242 Fed. Appx. 642 (11th Cir. June 20, 2007) | Yes (seeking asylum from Albania) [ER/credible fear referral] | 2/29/2008: BIA remand to IJ. 12/24/2008: ▮▮▮▮▮ (b) (6) (Appeal due 1/23/09) |
| Diana Toska, Gezim Toska, Klevis Toska, Anxhelina Toska (A77-253-077) | Denied on 2/24/2006 | Not removed. I-166 surrender letter sent on 2/27/2006, but alien did not show. | Remand to BIA to reconsider credibility determination because IJ and BIA failed to consider corroborating evidence in first instance; See 194 Fed. Appx. 767 (11th Cir. Sept. 6, 2006 | Yes (seeking asylum from (b) (6) . | 4/27/2007: BIA remand to IJ. (b) (6) ▮▮▮▮▮ |

| Carlos Augusto Alzate-Zuleta, Francy Trujillo, Julian David Alzate, Carlos Augusto Alzate-Trujillo, Natalia Alzate (A95-255-313) | Denied on 10/26/2006 | Petitioner and his two sons removed after stay was denied.<br><br>10/12/2006: arrested by FugOps. 11/9/2006: removed. | Vacate and remand after finding that evidence compelled conclusion that petitioners suffered past persecution; remand to see if government can rebut presumption of future persecution; See 238 Fed. Appx. 472 (June 22, 2007) | Yes (seeking asylum from Colombia) | 10/15/2007: BIA remand to IJ. Mother and daughter in the U.S.; DRO to pick-up and bring back Petitioner and sons. Next hearing: 5/21/2009. |
|---|---|---|---|---|---|
| Tijan Masire Camara (A79-059-207) | Denied on 9/7/2006 | 9/12/2006: reported per surrender letter. Returned with passport and plane ticket, as requested. Removed to<br><br>(b) (6) | Vacated and remanded to BIA after government filed motion to remand to BIA | (b) (6)<br><br>(b)(6) | 6/21/2007: BIA remand to IJ.<br>(b)(6) |
| Al Hafiz Jivan (A98-498-409) | Granted on 2/4/2008 "in light of the government's notice of non-opposition" (VD expired on 2/10/2008) | Not removed. Not in custody (reporting as required). | Vacate and remand to BIA with directions to remand to IJ | No | Circuit Court remand is pending at the BIA (as of 10/6/2008) |

26

**Saharsky, Nicole A (OSG)**

| | |
|---|---|
| **From:** | (b)(2) & (b)(6)                @dhs.gov] |
| **Sent:** | Friday, January 16, 2009 11:54 AM |
| **To:** | (b)(2) & (b)(6)                                    (DHS); |
| | (b)(2) & (b)(6) (DHS); Saharsky, Nicole A; Neiman-Kelting, Melissa (CIV) |
| **Subject:** | FW: Nken v. Mukasey, questions from the moot |

All,

There are quite a few email chains going around, so I want to make sure that everyone is on the same page. Below is our latest answer to the issue of returning aliens who are removed while a PFR is pending.

If the alien was lawfully residing in the US, or the alien's presence is required for continued proceedings, then yes, DHS will facilitate the alien's return to the US. But, where cases can be resolved without the alien's return, then we don't facilitate the alien's return (an example might be an IAC claim that was remanded to the Board because the Board failed to indicate in its decision that it considered an alien's specific argument, that can be resolved by re-briefing to the Board). It should also be noted that the alien is returned to the custody status from which he was removed. In my personal experience, many aliens have declined to come back to the US because they do not want to be returned to custody after having been at liberty in their native land. The alien is responsible for paying his way back if the removal was proper at the time it occurred. As a matter of internal institutional convenience, DHS paroles the alien back into the US (CBP requires parole). However, if the alien had legal standing prior to removal that would have been lost because of the removal, the alien is treated for practical purposes as if he had not lost that legal standing. Thus, an alien who was an LPR and removed, then returns after a PFR would have the parole paperwork executed, but upon return would be treated as an LPR as if the removal had not happened. For an overstay, the alien would continue to be treated as an overstay in removal proceedings after he returns, although the parole would be the document that effectuated his entry into the US if he had to come back.

(b)(2) & (b)(6)

1

17

**Saharsky, Nicole A (OSG)**

| | |
|---|---|
| From: | Neiman-Kelting, Melissa (CIV) |
| Sent: | Friday, January 16, 2009 2:19 PM |
| To: | Kneedler, Edwin S; Saharsky, Nicole A |
| Cc: | Neiman-Kelting, Melissa (CIV) |
| Subject: | NKEN- DHS Follow-ups |
| Attachments: | Nken Responses to SQ Questions.doc |

DHS responses to outstanding questions. They are still putting some language together to address the concern raised at the end of Wednesday's moot regarding the small percentage of actual removals. It should be ready by the end of the day.

Thank you,
Melissa

| | |
|---|---|
| From: | ▉▉▉ (b)(2) & (b)(6) ▉▉▉ dhs.gov] |
| Sent: | Friday, January 16, 2009 1:52 PM |
| To: | Neiman-Kelting, Melissa (CIV); ▉▉ (b)(2) & (b)(6) ▉▉ (DHS) |
| Cc: | ▉▉▉ (DHS) ▉▉▉ (b)(2) & (b)(6) ▉▉▉ |
| Subject: | RE: Follow-up for OSG on hurdles to removal |

Melissa,

Here are the answers we have been able to prepare. ICE did the work on these.

I have it pasted in the email and attached as MS Word.

▉▉▉

Responses to questions from OSG arising from the first Nken moot on 1/14/09

1. *In any case in which DHS has removed an alien in violation of a court-ordered stay, has DHS been held in contempt of court?*

   Each year, approximately 3-4 aliens are erroneously removed while a stay of removal is in effect. (This is an estimate based upon experience, not readily available statistical data.) It is the consensus among the individuals consulted at ICE, that DHS has never been held in contempt of court as a result of its actions. The erroneous removal of aliens during the pendency of a stay is almost exclusively attributable to miscommunication or human clerical error. This could be the reason why DHS has not been held in contempt of court for its actions.

2. *How is an alien who is physically removed from the United States during the pendency of a petition for review returned to the United States if the petition for review is sustained?*

   If the alien was lawfully residing in the U.S. prior to the removal order which was vacated by the petition for review, or the alien's presence is required for continued proceedings, then DHS will facilitate the alien's return to the U.S. Where cases can be resolved without the alien's return, then DHS does not facilitate the alien's return (an example might be an ineffective assistance of counsel claim that was remanded to the Board of Immigration Appeals (Board) because the Board failed to indicate in its decision that it considered an alien's specific argument).

1

It should be noted that the alien is returned to the custody status in which he was prior to his removal. As such, many aliens have declined to return to the U.S. because they do not want to be returned to custody after having been at liberty in their country of origin.

The alien is responsible for paying any expenses incurred in returning to the U.S. if the removal was proper at the time it occurred. As a matter of internal institutional convenience, DHS paroles the alien back into the U.S. Meanwhile, if the alien had lawful immigration status (i.e. permanent resident status) prior to his removal, the alien is treated for practical purposes as if he had never lost that status.

3. *How much detention space (number of beds) does DHS have?*

On an average day, ICE houses an average of 29,786 aliens. (DHS is trying to obtain the actual number of beds available.)

4. *If an alien is removed during the pendency of a petition for review, but succeeds on the petition for review, does DHS apply the ground of inadmissibility under 8 USC 1182(a)(9)(A)/INA § 212(a)(9)(A)? 8 USC 1182(a)(9)(B)/INA § 212(a)(9)(B)?*

[DHS hopes that there are no reference to 8 USC 1182(a)(9) but provides these answers in case they do.] Such alien would not be rendered inadmissible under 8 USC 1182(a)(9)(A) (aliens previously removed) because the alien's removal was ultimately deemed unlawful. Such an alien would not be deemed inadmissible pursuant to 8 USC 1182(a)(9)(B) (unlawful presence) because as they are paroled back into the U.S., even if ICE allows them to return to lawful permanent resident status (not an issue for Nken), they are not examined for admissibility. It is an unresolved issue whether 1182(a)(9)(B) would apply for seeking adjustment of status following parole.

5. *What is the percentage of aliens that are removed while a petition for review is pending in their case?*

[DHS is still trying to get an answer]

6. *What is the number of fugitive aliens in the U.S. (i.e., aliens present in the United States with outstanding final order of removal)?*

As of October 1, 2007, ICE's fugitive case backlog consisted of 594,756 aliens. On October 1, 2006, ICE's fugitive case backlog consisted of 632,726.

7. *How does DHS decide to issue a "call-in letter" or a "bag and baggage letter" to an alien with a final order of removal? What percentage of aliens comply with such letters?*

[DHS is still trying to get an answer]

8. *Does DHS attempt to obtain travel documents for aliens prior to sending such letters?*

DHS does not attempt to obtain a travel document for an alien until the alien is in detention. Often times, the travel documents issued for purposes of removal of an alien have a short validity. Some countries will not issue a second travel document if the first expires.

9. *What is the total number of aliens removed from the United States each year? (If possible, distinguish between traditional removal proceedings, expedited removal, administrative removal, reinstatements, etc.)*

19

In Fiscal Year (FY) 2007, ICE removed 276,912 aliens from the United States  This figure includes 40,534 individuals that returned voluntarily.  Of the total aliens removed, 102,777 were fugitives.

Questions Specific to Nken-

1. *Is Nken currently detained?*

   Yes, Nken is currently detained at the Howard County Detention Center in Jessup, MD.

2. *How long has he been detained?*

   Nken was taken into detention on August 9, 2006.  He has been detained at the Howard County Detention Center since May 30, 2008.

3. *Are there any reasons why DHS did not attempt to remove him in the years since he was first ordered removed (other than the time that he physically resisted removal and his current refusal to help get travel documents)?*

   On March 04, 2005, Nken was ordered removed by an Immigration Judge.  It was not until his appeal was dismissed by the Board on June 16, 2006, that DHS had the legal authority to remove him. Since this date, Nken has filed a number of motions to reopen and petitions for review.

4. *What caused ICE to pursue Nken's removal when it did?*

   Nken was arrested when he appeared at the USCIS Baltimore District Office for an interview on the Petition for Alien Relative (Form I-130) filed on his behalf by his wife.

(b)(2) & (b)(6)
*Acting Associate General Counsel - Immigration*
U.S. Department of Homeland Security
Office of the General Counsel
Desk: 202-282-
Cell: 202-63
Fax: 202-447
(b)(2) & (b)(6)@dhs.gov

This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited.  If you have received this in error, please reply immediately to the sender and delete this message.

3

20

Responses to questions from OSG arising from the first Nken moot on 1/14/09

1.  *In any case in which DHS has removed an alien in violation of a court-ordered stay, has DHS been held in contempt of court?*

Each year, approximately 3-4 aliens are erroneously removed while a stay of removal is in effect. (This is an estimate based upon experience, not readily available statistical data.) It is the consensus among the individuals consulted at ICE, that DHS has never been held in contempt of court as a result of its actions. The erroneous removal of aliens during the pendency of a stay is almost exclusively attributable to miscommunication or human clerical error. This could be the reason why DHS has not been held in contempt of court for its actions.

2.  *How is an alien who is physically removed from the United States during the pendency of a petition for review returned to the United States if the petition for review is sustained?*

If the alien was lawfully residing in the U.S. prior to the removal order which was vacated by the petition for review, or the alien's presence is required for continued proceedings, then DHS will facilitate the alien's return to the U.S. Where cases can be resolved without the alien's return, then DHS does not facilitate the alien's return (an example might be an ineffective assistance of counsel claim that was remanded to the Board of Immigration Appeals (Board) because the Board failed to indicate in its decision that it considered an alien's specific argument).

It should be noted that the alien is returned to the custody status in which he was prior to his removal. As such, many aliens have declined to return to the U.S. because they do not want to be returned to custody after having been at liberty in their country of origin.

The alien is responsible for paying any expenses incurred in returning to the U.S. **if the removal was proper at the time it occurred.** As a matter of internal institutional convenience, DHS paroles the alien back into the U.S. Meanwhile, if the alien had lawful immigration status (i.e. permanent resident status) prior to his removal, the alien is treated for practical purposes as if he had never lost that status.

3.  *How much detention space (number of beds) does DHS have?*

On an average day, ICE houses an average of 29,786 aliens. (DHS is trying to obtain the actual number of beds available.)

4.  *If an alien is removed during the pendency of a petition for review, but succeeds on the petition for review, does DHS apply the ground of inadmissibility under 8*

21

*USC 1182(a)(9)(A)/INA § 212(a)(9)(A)?  8 USC 1182(a)(9)(B)/INA §*
*212(a)(9)(B)?*

[DHS hopes that there are no reference to 8 USC 1182(a)(9) but provides these
answers in case they do.] Such alien would not be rendered inadmissible under 8
USC 1182(a)(9)(A) (aliens previously removed) because the alien's removal was
ultimately deemed unlawful. Such an alien would not be deemed inadmissible
pursuant to 8 USC 1182(a)(9)(B) (unlawful presence) because as they are paroled
back into the U.S., even if ICE allows them to return to lawful permanent resident
status (not an issue for Nken), they are not examined for admissibility. It is an
unresolved issue whether 1182(a)(9)(B) would apply for seeking adjustment of
status following parole.

5. *What is the percentage of aliens that are removed while a petition for review is*
   *pending in their case?*

   [DHS is still trying to get an answer]

6. *What is the number of fugitive aliens in the U.S. (i.e., aliens present in the United*
   *States with outstanding final order of removal)?*

   As of October 1, 2007, ICE's fugitive case backlog consisted of 594,756 aliens.
   On October 1, 2006, ICE's fugitive case backlog consisted of 632,726.

7. *How does DHS decide to issue a "call-in letter" or a "bag and baggage letter" to*
   *an alien with a final order of removal?  What percentage of aliens comply with*
   *such letters?*

   [DHS is still trying to get an answer]

8. *Does DHS attempt to obtain travel documents for aliens prior to sending such*
   *letters?*

   DHS does not attempt to obtain a travel document for an alien until the alien is in
   detention. Often times, the travel documents issued for purposes of removal of an
   alien have a short validity. Some countries will not issue a second travel
   document if the first expires.

9. *What is the total number of aliens removed from the United States each year?  (If*
   *possible, distinguish between traditional removal proceedings, expedited removal,*
   *administrative removal, reinstatements, etc.)*

   In Fiscal Year (FY) 2007, ICE removed 276,912 aliens from the United States
   This figure includes 40,534 individuals that returned voluntarily.  Of the total
   aliens removed, 102,777 were fugitives.

# Exhibit B

Nken v. Mukasey Chart for DHS

| Case Name/ Alien Name | Stay of Removal Granted or Denied? | Was Alien Removed After Stay Denied? | 11th Circuit's Decision | Involve Asylum Claim? | Ultimate Disposition/Was Alien Returned to U.S. if previously removed? |
|---|---|---|---|---|---|
| Sergio Omar Beldorati (A97-927-591) | Denied on 1/9/2007 | VWPP removal to Argentina on 1/24/2007 (11th Cir. notified in advance of imminent removal) | Remand to BIA to determine whether alien suffered past persecution (was not addressed by IJ/BIA); See 228 Fed. Appx. 952 (11th Cir. June 21, 2007) | Asylum denied as untimely. Seeking W/H under INA § 241(b)(3) from Argentina. [As a VWPP violator he was in "asylum only" proceedings.] | 3/10/2008: BIA remand to IJ. 7/16/2008: IJ oral decision denying ███ noting on minute order: "Addressing ███ (b)(6) is meaningless as respondent's stay of removal was denied by 11th Circuit and the respondent has been removed" and "No communication from any counsel on behalf of respondent" |
| Edi Saliaj (A77-636-927) | Denied on 9/14/2006 | Not removed. (Saliaj was previously removed on 9/21/2000 and tried to re-enter in 2002, leading to the instant case.) | Remand to IJ to determine whether alien suffered past persecution because IJ did not address that; See 242 Fed. Appx. 642 (11th Cir. June 20, 2007) | Yes (seeking asylum from Albania) [ER/credible fear referral] | 2/29/2008: BIA remand to IJ. 12/24/2008: An IJ ordered removal after denying Saliaj's applications for ███ (b)(6) (Appeal due 1/23/09) |
| Diana Toska, Gezim Toska, Klevis Toska, Anxhelina Toska (A77-253-077) | Denied on 2/24/2006 | Not removed. I-166 surrender letter sent on 2/27/2006, but alien did not show. | Remand to BIA to reconsider credibility determination because IJ and BIA failed to consider corroborating evidence in first instance; See 194 Fed. Appx. 767 (11th Cir. Sept. 6, 2006 | Yes (seeking asylum from ███ (b)(6) . | 4/27/2007: BIA remand to IJ. Petitioners ultimately granted ███ (b)(6) on June 9, 2008 |

15

| Carlos Augusto Alzate-Zuleta, Francy Trujillo, Julian David Alzate, Carlos Augusto Alzate-Trujillo, Natalia Alzate (A95-255-313) | Denied on 10/26/2006 | Petitioner and his two sons removed after stay was denied.<br><br>10/12/2006: arrested by FugOps. 11/9/2006: removed. | Vacate and remand after finding that evidence compelled conclusion that petitioners suffered past persecution; remand to see if government can rebut presumption of future persecution; See 238 Fed. Appx. 472 (June 22, 2007) | Yes (seeking asylum from Colombia) | 10/15/2007: BIA remand to IJ. Mother and daughter in the U.S.; DRO to pick-up and bring back Petitioner and sons. Next hearing: 5/21/2009. |
|---|---|---|---|---|---|
| Tijan Masire Camara (A79-059-207) | Denied on 9/7/2006 | 9/12/2006: reported per surrender letter. Returned with passport and plane ticket, as requested. Removed to (b)(6) ███ | Vacated and remanded to BIA after government filed motion to remand to BIA | ███ denied as untimely. Seeking (b)(6) ████<br><br>(b)(6) ████ | 6/21/2007: BIA remand to IJ. 11/7/2007: IJ determined that further testimony not necessary [Petitioner would have been brought to a POE if testimony was necessary]. Denied (b)(6) ████ |
| Al Hafiz Jivan (A98-498-409) | Granted on 2/4/2008 "in light of the government's notice of non-opposition" (VD expired on 2/10/2008) | Not removed. Not in custody (reporting as required). | Vacate and remand to BIA with directions to remand to IJ | No | Circuit Court remand is pending at the BIA (as of 10/6/2008) |

26

# Exhibit C

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

## 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens

| | |
|---|---|
| **Issue Date:** | February 24, 2012 |
| **Effective Date:** | February 24, 2012 |
| **Superseded:** | N/A |
| **Federal Enterprise Architecture Number:** | 306-112-002b |

1. **Purpose/Background.** Under the Immigration and Nationality Act (INA), as amended, aliens who petition the circuit courts of appeals for review of their administrative removal orders may continue to litigate their petitions after their removal from the United States. Absent a court-ordered stay of removal, U.S. Immigration and Customs Enforcement (ICE) may lawfully remove such aliens while their petitions for review (PFRs) are pending. This Directive describes existing ICE policy for facilitating the return to the United States of certain lawfully removed aliens whose PFRs are granted by a U.S. court of appeals or the U.S. Supreme Court. This Directive applies only to supervisors in Enforcement and Removal Operations (ERO), Homeland Security Investigations (HSI), and the Office of the Principal Legal Advisor (OPLA). This Directive does not apply to bargaining unit employees.

2. **Policy.** Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings. ICE will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order and may detain the alien upon his or her return to the United States. If the presence of an alien who prevails on his or her PFR is not necessary to resolve the administrative proceedings, ICE will not facilitate the alien's return. However, if, following remand by the court to the Executive Office for Immigration Review (EOIR), an alien whose PFR was granted and who was not returned to the United States is granted relief by EOIR or the Department of Homeland Security (DHS) allowing him or her to reside in the United States lawfully, ICE will facilitate the alien's return to the United States.

3. **Definitions.** The following definitions apply for purposes of this Directive only:

3.1. **Facilitate an Alien's Return.** To engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry. Facilitating an alien's return does not necessarily

2

include funding the alien's travel via commercial carrier to the United States or making flight arrangements for the alien.

**3.2.**   **Petition for Review (PFR).**  A request for a U.S. court of appeals to review a removal order entered by ICE or EOIR under 8 U.S.C. § 1252, INA § 242.  The U.S. courts of appeals' PFR decisions are subject to review by the U.S. Supreme Court through a petition for writ of certiorari.

**3.3.**   **Restore an alien to lawful permanent resident (LPR) status**.  To enter a judicial decision which renders non-final an administrative removal order against an LPR. *See Matter of Lok*, 18 I&N Dec. 101 (BIA 1981) (holding that an LPR retains such status until the entry of a final administrative order of removal), *aff'd*, 681 F.2d 107 (2d Cir. 1982).  Practically speaking this means that, when a PFR is granted that returns a former LPR to the posture of a pre-order alien, the alien will once again, in contemplation of law, be an LPR even though removal proceedings may still be pending before EOIR on remand from the circuit court.

**3.4.**   **Stay of Removal**.  An order issued by EOIR or a federal court which prevents ICE from executing a removal order.

**4.**   **Responsibilities.**

**4.1.**   ERO, HSI, and OPLA supervisors must fully coordinate at the local, international, and Headquarters levels to effectuate this policy.

**5.**   **Procedures/Requirements.**  None

**6.**   **Authorities/References.**

**6.1.**   INA § 101(a)(20), 8 U.S.C. § 1101(a)(20).

**6.2.**   INA § 212(d)(5), 8 U.S.C. § 1182(d)(5).

**6.3.**   INA § 242, 8 U.S.C. § 1252.

**6.4.**   8 Code of Federal Regulations (CFR) § 212.5.

**6.5.**   DHS Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Customs Enforcement" (November 13, 2004).

**6.6.**   Memorandum of Agreement (MOA) between United States Citizenship and Immigration Services (USCIS), ICE, and Customs and Border Protection (CBP), "Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States" (September 29, 2008).

3

6.7.    MOA between ICE and CBP, "Significant Public Benefit Parole Protocol for U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement for Law Enforcement Purposes" (September 22, 2005).

6.8.    *Matter of Lok*, 18 I&N Dec. 101 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982).

7.    **Attachments.** None

8.    **No Private Right.** This Directive is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.


John Morton
**Director**
**U.S. Immigration and Customs Enforcement**

# Exhibit D



**U.S. Department of Justice**

Office of the Solicitor General

---

*Washington, D.C. 20530*

April 24, 2012

The Honorable William K. Suter
Clerk, The Supreme Court of the United States
Washington D.C. 20543

   Re: *Jean Marc Nken* v. *Holder*, S. Ct. No. 08-681

Dear Mr. Suter:

  This letter is submitted in order to clarify and correct a statement contained in the government's brief in *Nken* v. *Holder*, 556 U.S. 418 (2009), which was submitted to this Court on January 7, 2009.[1]

  In *Nken*, this Court considered the standards for resolving an alien's request for a stay of removal pending judicial review of the removal order. The petitioner argued that, in deciding whether to grant a stay, courts should apply the traditional stay factors: whether an applicant is likely to succeed on the merits; whether the applicant will be irreparably harmed absent a stay; whether other interested parties would be injured by a stay; and "where the public interest lies." 556 U.S. at 425-426. The government contended that a court may not stay a removal "unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 8 U.S.C. 1252(f)(2). See 556 U.S. at 426. In responding to an argument by amici curiae suggesting that the government's position would create a serious constitutional question under the Suspension Clause, the government's brief contended that an alien ordinarily need not remain in the United States to take advantage of a favorable judicial ruling because, *inter alia*:

---

  [1] The government undertook a review of the accuracy of that statement following a district court decision in Freedom of Information Act (FOIA) litigation seeking the basis for the government's statement. See *National Immigration Project of the National Lawyers Guild* v. *United States Department of Homeland Security*, 2012 WL 375515 (S.D.N.Y. Feb. 7, 2012) (App. A, *infra*) (ordering disclosure under FOIA of portions of certain documents from the Office of the Solicitor General consisting of emails and attachments that were generated in preparation of the government's brief in *Nken* and for oral argument).

The Honorable William K. Suter
April 24, 2012
Page 2

> By policy and practice, the government accords aliens who were removed pending judicial review but then prevailed before the courts effective relief by, *inter alia*, facilitating the aliens' return to the United States by parole under 8 U.S.C. 1182(d)(5) if necessary, and according them the status they had at the time of removal.

08-681 Resp. Br. 44 (filed Jan. 7, 2009).

The government did not cite a source for that proposition. The government's representation was premised on interagency communications exchanged during the preparation of the government's brief concerning facilitation of return and restoration of pre-removal status for an alien who prevails on judicial review.[2] In substance, those communications contained the following information. To effectuate return, the government would generally grant parole and send a cable to the consulate or embassy nearest to the alien with instructions to issue a travel document to the alien. The issue was not addressed by statute, and the government had not established a procedure as such: the volume of such cases was not large, and they were handled on a case-by-case basis. Whether the government would parole the alien into the country could depend on the nature of the judicial relief, including whether the alien was entitled to resume lawful status based on the favorable judicial decision. It could also depend on whether the alien's presence was necessary for further administrative proceedings on remand (if it was not necessary, the alien would probably not be returned). The alien was responsible for providing his or her own transportation to the United States. The alien's status upon return would be based on the status he had at the time of removal. If the alien was in detention before removal, the alien could be returned to detention upon arrival.[3]

---

[2] The information described in the text is reflected in interagency emails, which the district court in *National Immigration Project* has ordered the government to disclose in redacted form. App. A, *infra*. The government is not appealing from those orders. In order to place the court-ordered disclosures in context, the government is releasing the full text of the emails in unredacted form, redacting only limited information—including on a matter subject to the district court's approval—whose release might impair individual privacy interests. The government will lodge those documents with the Clerk of the Court upon request.

[3] The information was later distilled in a January 16, 2009, communication in preparation for oral argument, which the district court in *National Immigration Project* also ordered to be disclosed. In substance, that communication confirmed that if an alien had been lawfully residing in the United States, or the alien's presence was required for continued proceedings, the government would facilitate his return. The communication also described the government's approach.

The Honorable William K. Suter
April 24, 2012
Page 3

The statement in the government's brief was intended to encapsulate the core aspects of this information. But without providing additional detail about the government's approach to effectuating return and restoring status, the statement that relief was accorded "[b]y policy and practice" suggested a more formal and structured process than existed at the time. The government should have provided a more complete and precise explanation.

In *Nken*, the Court rejected the government's legal position that the requirements for a stay pending judicial review were controlled by 8 U.S.C. 1252(f)(2) and held instead that the traditional requirements for a stay applied. 556 U.S. at 432-433. In analyzing those traditional requirements, the Court stated that removal alone would not cause an alien irreparable injury because "those who prevail can be afforded effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal. See Brief for Respondent 44." *Nken*, 556 U.S. at 435.[4] Lower courts have relied on this aspect of *Nken* in evaluating requests to stay removal pending judicial review. See, *e.g.*, *Leiva-Perez* v. *Holder*, 640 F.3d 962, 969 (9th Cir. 2011); *Villajin* v. *Mukasey*, 2009 WL 1459210, at *4 (D. Ariz. May 26, 2009).

The Court was correct that removed aliens who prevail on judicial review "can be afforded effective relief" through return and restoration of status and that such relief would negate irreparable harm from removal alone. Since the time of the Court's decision, however, declarations filed by the plaintiffs in the district court in *National Immigration Project* (see note 1, *supra*), as well as other documents that the government has produced to the plaintiffs in response to their Freedom of Information Act request, have raised questions about the promptness and consistency with which return has actually been accomplished.[5] Those materials identify some aliens who were removed during the pendency of their judicial review and returned to the United States after they prevailed before the federal courts, but who encountered significant impediments in returning. Those difficulties stemmed in part from the absence of a written, standardized process for facilitating return; the resulting

---

[4] The Court remanded the case to the Fourth Circuit. 556 U.S. at 436. On remand, the government agreed not to remove Nken pending the court of appeals' disposition of the petition for review, rendering moot "whether the 'traditional criteria' entitle Nken to a stay." *Nken* v. *Holder*, 585 F.3d 818, 821 (4th Cir. 2009).

[5] The declarations filed by the plaintiffs in *National Immigration Project* are available at http://www.nationalimmigrationproject.org/legalresources/cd_NIP_v._DHS_FOIA_Complaint_with_exhibits.pdf.

The Honorable William K. Suter
April 24, 2012
Page 4

uncertainty in how to achieve that objective in field offices, U.S. embassies and consulates, and other agencies involved in the process; and the lack of clear or publicly accessible information for removed aliens to use in seeking to return if they received favorable judicial rulings.

In light of those materials, the government is not confident that the process for returning removed aliens, either at the time its brief was filed or during the intervening three years, was as consistently effective as the statement in its brief in *Nken* implied. The government therefore believes that it is appropriate both to correct its prior statement to this Court and to take steps going forward to ensure that aliens who prevail on judicial review are able to timely return to the United States.

On February 24, 2012, John Morton, Director of U.S. Immigration and Customs Enforcement (ICE), the agency primarily charged with effectuating aliens' removal from the United States, issued a directive affirming the agency's commitment to facilitate return and providing greater detail about the circumstances and process under which ICE will do so.[6] That directive explains in particular that, "[a]bsent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR [petition for review] was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings." It further states that "ICE will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order and may detain the alien upon his or her return to the United States." ICE Directive 11061.1 ¶ 2.

To implement that directive, ICE has designated its Public Advocate as an initial point of contact for aliens seeking help in facilitating their return. The Public Advocate will direct the request to the appropriate ICE office and provide a further point of contact within ICE. ICE will coordinate with other components of the Department of Homeland Security to facilitate return, where it is appropriate. At the time of removal, ICE will also provide written notice to the alien concerning the process for facilitating return in the event of a favorable judicial ruling.[7] In addition, ICE has posted information on its website to advise

---

[6]    App. B, *infra*.    The directive is also available at http://www.ice.gov/doclib/foia/dro_policy_memos/11061.1_current_policy_facilitating_return.pdf.

[7] App. C, *infra*.

The Honorable William K. Suter
April 24, 2012
Page 5

aliens, their representatives, and the general public about the process for return.[8]  The State Department has advised its embassies and consulates around the world that if posts are contacted by an alien who prevailed on review and requests assistance in returning to the United States, the post should advise the alien to contact ICE's Public Advocate.  Posts are also directed to process expeditiously cases in which ICE has determined that it will facilitate an alien's return to the United States.[9]  Relevant government agencies may take additional steps to further improve these measures, if necessary or appropriate.

Since the middle of February 2012, while considering the issues discussed in this letter, the government has refrained from relying on the Court's statement in *Nken* in responding to applications to stay removal pending judicial review.[10]  In stay litigation going forward, where the government contends that removal alone does not constitute irreparable harm, it will submit to the lower courts the procedures to facilitate return described above.  In addition, in pending cases, it will submit letters on this issue pursuant to Fed. R. App. P. 28(j) where appropriate.  Lower courts will therefore have the opportunity to address the adequacy of the government's procedures for facilitating return in evaluating requests for stays of removal.[11]  The government will also notify the American Immigration Lawyers Association and immigration advocacy groups that, upon request with respect to a specific alien who was removed before prevailing in the courts, the government will investigate and

---

[8]    App.  D,  *infra*.    The  information  is  available  at http://www.ice.gov/about/offices/enforcement-removal-operations/publicadvocate/faq.htm.

[9]  App. E, *infra*.

[10]  This Office is aware of one filing since that time in which the government, in responding to an application for stay of removal, relied on *Nken* in arguing that an alien would not suffer irreparable harm from the fact of removal alone.  See Gov't Opp. to Petitioner's Emergency Mot. for a Stay of Removal at 10-11, *Lam* v. *Holder*, No. 11-2576 (7th Cir. filed Mar. 1, 2012).  On March 8, 2012, the government withdrew its opposition to Lam's stay application.

[11]  For example, in one recent case in which the government argued that an alien could not show irreparable harm because removal was not imminent, see Resp. Opp. to Petitioner's Mot. for a Stay of Removal on the Basis that It Is Premature, *Lee* v. *Holder*, No. 12-120 (2d. Cir. Feb. 10, 2012), the Second Circuit directed the government to address, by May 5, 2012, the "questions raised" in the district court's decision in *National Immigration Project*, *supra*, regarding "whether, under what procedure, and on what legal basis the government" accords aliens who were removed but prevail on judicial review "effective relief."  See *Lee* v. *Holder*, No. 12-120 (2d. Cir. Apr. 5, 2012) (App. F, *infra*).

The Honorable William K. Suter
April 24, 2012
Page 6

facilitate the alien's return if appropriate in light of the policy and procedures described above.  The government does not believe that any action by this Court is required.

The government recognizes its special obligation to provide this Court with reliable and accurate information at all times.  The government sought to carry out that obligation in good faith in this case, and we regret the necessity for this letter.  Please circulate copies of this letter to the Members of the Court.

Sincerely,

Michael R. Dreeben
Deputy Solicitor General[*]

cc:    Counsel of record

---

[*] The Solicitor General and the Principal Deputy Solicitor General are recused in this case.

Jean Marc Nken v. Holder, 08-681


Lindsay C. Harrison
Jenner & Block LLP
1099 New York Ave., N.W.
Ste. 900
Washington, D.C.  20001
202-639-6865
lharrison@jenner.com

# APPENDIX A

Westlaw.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
NATIONAL IMMIGRATION PROJECT OF THE
NATIONAL LAWYERS GUILD, American Civil
Liberties Union Foundation, Immigrant Defense Project,
Post–Deportation Human Rights Project, and Rachel
Rosenbloom, Plaintiffs,
v.
UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, United States Citizenship and Immigration
Services, United States Customs and Border Protection,
United States Immigration And Customs Enforcement,
United States Department of Justice, United States
Department of State, Defendants.
No. 11 civ. 3235(JSR).

Feb. 7, 2012.
Order Granting Stay Feb. 24, 2012.
Nancy Babette Morawetz, New York, NY, for Plaintiffs.

Patricia L. Buchanan, Shane Patrick Cargo, U.S. Attorney
Office, New York, NY, for Defendants.

*OPINION AND ORDER*

JED S. RAKOFF, District Judge.

**\*1** "Trust everybody, but cut the cards," as the old
saying goes.[FN1] When the Solicitor General of the United
States makes a representation to the Supreme Court,
trustworthiness is presumed. Here, however, plaintiffs
seek to determine whether one such representation was
accurate or whether, as it seems, the Government's lawyers
were engaged in a bit of a shuffle.

Specifically, in 2009, in a brief addressed to the
Supreme Court, the Office of the Solicitor General
("OSG") represented that, "[b]y policy and practice, the
government accords aliens who were removed pending
judicial review but then prevailed before the courts
effective relief by, *inter alia,* facilitating the aliens' return

to the United States by parole under 8 U.S.C. 1182(d)(5)
if necessary, and according them the status they had at the
time of removal." Brief for Respondent at 44, *Nken v.
Holder,* 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550
(2009) (No. 08–681), 2009 WL 45980 at \*44. Although
the OSG did not support this assertion with any citation,
*id.,* the Supreme Court in *Nken,* in holding that deportation
of an alien before the resolution of an appeal from her
order of removal does not constitute irreparable injury,
expressly relied on this representation, stating that, "those
who prevail can be afforded effective relief by facilitation
of their return, along with restoration of the immigration
status they had upon removal. See Brief for Respondent
44." *Nken,* 129 S.Ct. at 1761.

To discover the factual basis for the OSG's
representation and determine the details of the asserted
policy, plaintiffs in this case filed a request under the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,
with the Department of Justice ("DOJ"), Department of
State ("DOS"), and Department of Homeland Security
("DHS"). In response to that request, the OSG produced
a mostly-redacted four-page chain of emails between the
attorneys who argued before the Supreme Court in *Nken*
and other government officials. See Decl. of Patricia L.
Buchanan dated October 28, 2011 Ex. B. The OSG sought
to justify the wholesale redactions on the basis of three
privileges embodied in 5 U.S.C. § 552(b)(5): the
work-product privilege,[FN2] the attorney-client privilege,
and the deliberative-process privilege.

On October 11, 2011, plaintiffs filed a motion for
summary judgment, requesting that this Court order
disclosure of the contents of the emails. On October 31,
2011, the Government cross moved for summary
judgment, requesting that the Court uphold the assertions
of privilege. Both parties consented to *in camera* review
of the emails. *See* Government's Memorandum of Law
dated October 28, 2011 at 25; Plaintiffs' Memorandum of
Law in Reply to Government's Opposition dated
November 9, 2011 at 10. Accordingly, the Court
conducted such a review. Based on that review, and the
parties' submissions and arguments, the Court hereby

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

partially grants and partially denies the motions by ordering disclosure of the portions of the emails that contain factual statements concerning the aforementioned policy and practice.

*2 "Summary judgment is the preferred procedural vehicle for resolving FOIA disputes." *Bloomberg L.P. v. Bd. of Governors of Federal Reserve Sys.*, 649 F.Supp.2d 262, 271 (S.D.N.Y.2009). Although a party requesting summary judgment must demonstrate that there is "no genuine dispute as to any material fact" and that she is "entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(a), here the essential facts are undisputed:[FN1]

On December 17, 2009, plaintiffs filed a FOIA request with the DOJ, the DHS, and the DOS seeking information about the factual basis for the representation made in *Nken, viz.*, that the Government has a policy and practice of facilitating deported aliens' return and restoring their prior immigration status if they successfully appeal their removal decisions. Plaintiffs' Rule 56.1 Statement of Uncontested Facts ¶ 13. The DOS did not produce any records in response to plaintiffs' request. *Id.* ¶ 22. The DOJ referred the request to the OSG, and on February 8, 2011, after some clarification by plaintiffs, the OSG informed plaintiffs that a search yielded only the four-page email chain at issue in this opinion. *Id.* ¶¶ 14–17. The OSG indicated that it would withhold those records under 5 U.S.C. § 522(b)(5). *Id.* The DOJ also referred plaintiffs' request to its Civil Division, which produced only two, here-irrelevant documents and a list of cases. *Id.* ¶ 20.

The DHS referred plaintiffs' FOIA request to three of its divisions: Customs and Border Protection ("CBP"), Immigration and Customs Enforcement ("ICE"), and Citizenship and Immigration Services ("CIS"). *Id.* ¶ 23. CIS responded by referring plaintiffs to two forms used by individuals who have been deported or are inadmissible. *Id.* ¶ 24. Neither form contains any specific information for individuals whose removal orders are reversed. *Id.* ¶¶ 25–26. In response to further requests, on May 24, 2011, CIS wrote, "USCIS does not have a specific policy, program and/or guidance memo regarding a process for aliens wrongfully removed/deported from the United States." *Id.* ¶ 28, Ex. L. CBP informed plaintiffs that it has no set procedure for facilitating return. *Id.* ¶ 33. CBP does

not track cases referred for judicial action and has no method for identifying whether an alien has succeeded on appeal. *Id.* ¶ 35.

ICE identified 2,650 pages of responsive records, and plaintiffs agreed to receive 500 pages every two weeks. *Id.* ¶ 31. As of October 7, 2011, plaintiffs had received 1,000 pages. *Id.* ¶ 36. None of the records produced identifies a written policy. *Id.* ¶ 36. In some instances, significant public benefit parole is used to return aliens who have prevailed on appeal. *Id.* ¶ 38, Ex. Y. ICE records show that officials frequently do not know whom they should contact to facilitate return. *Id.* ¶ 39. In some situations where ICE used parole, agency employees still expressed confusion about how to physically return a deportee. *Id.* ¶ 42, Ex. X. For example, in one email from 2009, an undisclosed person writes, "How this is handled has alw [redacted] haphazard." *Id.* ¶ 44, Ex. X. Other records admit that the Government's use of parole would not restore the status that removed aliens had prior to their removal. *Id.* ¶ 48. ICE records do not contain any publicly accessible forms or instructions for individuals whose removal orders have been reversed or vacated. *Id.* ¶ 50.

*3 On August 8, 2011, the Government directed plaintiffs' attention to a Memorandum of Agreement ("MOA") between CIS, ICE and CBP. *Id.* ¶ 45. As noted, *supra*, the MOA is also one of the two documents that the Government provided for this litigation. Decl. of Patricia L. Buchanan dated October 28, 2011, Ex. A(MOA). An Addendum to the MOA provides that:

ICE will adjudicate parole requests relating to aliens in removal proceedings or who have final orders, as well as aliens granted deferred action by ICE at any point after the commencement of removal proceedings, regardless of whether the alien is within or outside of the United States. Given the context of removal proceedings, it is anticipated that parole of such aliens would occur only in very rare circumstances.

*Id.* at 6. The MOA also notes that, under current practice, "DHS bureaus have generally construed 'humanitarian' paroles ... as relating to urgent medical, family, and related needs and 'significant public benefit paroles [sic] ... as limited to persons of law enforcement

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

interest such as witnesses to judicial proceedings." *Id.* at 2.

Against this factual background, the Court turns to the issues of law. "Upon request, FOIA mandates disclosure of records held by a federal agency, see 5 U.S.C. § 552, unless the documents fall within enumerated exemptions, see § 552(b)." *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). Furthermore, FOIA specifically requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B). Nonetheless, FOIA, under 5 U.S .C. § 552(b)(5), exempts from production documents protected by the attorney-client, workproduct, and deliberative-process privileges.[FN4] Whenever the Government invokes a FOIA exemption, it bears the burden of "establish[ing its] right to withhold information from the public." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 861 (D.C.Cir.1980)[FN5]

The plaintiffs argue that the facts set forth in their Rule 56.1 statement reveal (i) that confusion exists about how aliens who prevail on appeals from their removal orders may obtain effective relief, (ii) that no widely known procedures exist for restoring those aliens to the status they had before their removals, and (iii) that the public has neither knowledge of nor access to the policies and procedures to which the OSG referred in *Nken.* Thus, they claim that disclosure of the email chain at issue in this case will either clarify the policy for the public or reveal how the OSG mistakenly asserted that a policy existed when none, in fact, did. At oral argument, the Government conceded that it does not dispute that plaintiffs have a proper basis for making a FOIA request. *See* Transcript, 11/17/11, at 27:14–15. Rather, as noted above, the Government argues that the attorney-client, the work-product, and the deliberative-process privileges protect the entire contents of the four-page email chain from disclosure. The Court considers each of these privileges in turn, finding that none protects statements of fact in the email chain that relate to the representation the OSG made in *Nken.*

*4 Turning first to the work-product privilege, this

privilege protects an attorney's ability to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The privilege is now codified in Federal Rule of Civil Procedure 26(b)(3)(A), which states: "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative...." The privilege often extends to "correspondence" such as the emails at issue here. *Hickman,* 329 U.S. at 511. Nonetheless, the work-product privilege "may be waived," and a litigant may "no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination." *United States v. Nobles,* 422 U.S. 225, 239–40, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

Plaintiffs make two related arguments for overcoming the Government's assertion of work-product privilege. First, they argue that, because none of the other materials provided by the Government contain any evidence to support the OSG's representation in *Nken,* the email chain must contain the OSG's factual basis for that representation. As a result, plaintiffs conclude, the OSG's representation constituted "unilateral testimonial use" of the email chain, and *Nobles* prevents the Government from asserting the workproduct privilege to shield that chain from disclosure. Second, plaintiffs argue that the "fairness doctrine," which prevents "selective disclosure during litigation of otherwise privileged information," requires the Government to disclose the email chain in order to "to prevent prejudice to [other] part[ies] and distortion of the judicial process." *In re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987).[FN6] These arguments, however, apply only to the portions of the emails' contents that factually describe (or refute) the alleged policy or practice. The arguments have no relevance to the portions of the emails that describe mental impressions, litigation strategy, and other "core" work-product. It is clear to the Court, upon review of the emails, that they do contain, in part, such core work-product, *see* Decl. of Patricia L. Buchanan dated October 28, 2011 Ex. B (describing the emails' contents as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

"[c]onsultations among attorney [sic] ... regarding draft of government's brief"), but that there are also factual recitations about existing practices that are independent of, and easily severable from, the core work-product. The Court will therefore limit its discussion to the question of whether these factual contents are protected from disclosure.

To protect even these factual contents of the email chain, the Government makes three arguments so far as work-product privilege is concerned. First, it argues that the OSG did not rely upon the email chain when it made its representation in *Nken*. The Government claims that, instead, the OSG relied on 8 U.S.C. § 1182(d)(5), which provides for the use of parole "for urgent humanitarian reasons or significant public benefit," and on the MOA between ICE, CBP, and CIS, which provides that "ICE will adjudicate parole requests relating to aliens in removal proceedings or who have final orders ... regardless of whether the alien is within or outside of the United States."

*5 As described below, the emails themselves (reviewed by the Court *in camera* ) refute this argument on their face. Independently, moreover, the argument is without basis. Neither § 1182(d)(5) nor the MOA provide a factual basis for the claim that the Government has a "policy and practice" of "facilitating [wrongly deported] aliens' return to the United States ... and according them the status they had at the time of removal." The MOA only allocates responsibility for adjudicating parole requests to ICE, revealing nothing about the Government's purported use of such requests for the specific purpose of returning deportees who prevail on appeal. And the language of 8 U.S.C. § 1182(d)(5) suggests, if anything, that the statute does not serve the purpose of returning deportees. Specifically, the statute provides that the Attorney General may "parole" aliens "into the United States temporarily" and that "when the purposes of such parole shall ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). Moreover, parole does not accord aliens the status they had at the time of removal. *See* 8 U.S.C. § 1182(d)(5)(A) (specifying that "parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall ... have been served ... [the

alien's] case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States"). In short, neither 8 U.S.C. § 1182(d)(5)(A), nor the MOA, nor any other evidence here proffered by the Government supports the suggestion that the OSG's representation in *Nken* was based on anything other than the facts provided to the OSG in the email chain here at issue.

By contrast, the email chain (as reviewed by the Court *in camera* ) evidences an attempt to cobble together a factual basis for making the representation the OSG made to the Court in *Nken*. This basis consisted of information obtained as to how various relevant agencies commonly handle the return of deportees who prevail on appeal and the restoration of their immigration status. Given the absence of public disclosure of these agencies' practices and the Government's assertion that it has adopted a policy, such assertions must amount to a statement of policy.[FN7] Accordingly, the OSG's representation-which it made in a brief to this nation's highest court-constituted "unilateral testimonial use" of the email chain at issue in this case and is not protected by work-product privilege.

Second, the Government argues that, even if the OSG made "unilateral testimonial use" of the email chain, the rules of *Nobles* and *In re von Bulow* do not apply because, in each of those cases, litigants invoked privileged materials at trial, rather than on appeal. According to the Government, different procedural safeguards apply at trial and on appeal. Thus, the Government concludes, even if at trial plaintiffs might have been entitled to disclosure of the email chain, on appeal they must rely on reply briefs and pointed questioning at oral argument.

*6 The Government, however, cites no authority in support of its distinction between the effect of "unilateral testimonial use" of privileged material at trial and on appeal, and the Court finds this purported distinction illusory. The Government wholly ignores the fact that, in *Nken*, unlike in most appeals, the OSG made a factual representation, unsupported by any citation to the record, and intended that the Court rely on it, which the Court did. In such circumstances, to claim that the procedural safeguards that attend unilateral use of a factual assertion do not apply is pure gamesmanship. Even on appeal,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

courts have every reason to subject the bases of parties' factual claims to some modest testing, before which any claim of work-product privilege must yield. A different approach would permit the very "distortion of the judicial process" that the fairness doctrine attempts to avoid. Indeed, in this very case, the plaintiffs have provided substantial evidence that the judicial process may have been impugned if the Supreme Court relied upon what may well have been inaccurate or distorted factual representation. Thus, the Court concludes, under *Nobles,* that the OSG's "unilateral testimonial use" on appeal of the substance of the facts set forth in the email chain renders inapplicable the Government's recourse to the work-product privilege.

Third, the Government argues that requiring disclosure of the email chain will vitiate the work-product privilege by allowing plaintiffs to routinely access government attorneys' correspondences whenever those correspondences might arguably contain relevant factual materials. This argument, however, completely ignores the highly uncommon circumstances of this case. In *Nken,* the OSG made a new factual representation on appeal and cited nothing in the record to support it.[FN8] Moreover, the Government even has come forward with nothing of consequence to support its representation beyond the facts set forth in the emails. These highly unusual circumstances render the Government's "slippery slope" argument unavailing.

Turning next to attorney-client privilege, this privilege "protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance.... Its purpose is to encourage attorneys and their clients to communicate fully and frankly...." *In re County of Erie,* 473 F.3d 413, 418 (2d Cir.2007) (citations omitted). "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419. As with work-product privilege, discussed above, a party can waive attorney-client privilege by making "a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party." *In re Grand Jury*

*Proceedings,* 219 F.3d 175, 184 (2d Cir.2000).

*7 For the reasons described above, the OSG's "unilateral testimonial use" of the factual contents of the email chain constitutes "a deliberate decision to disclose privileged materials in a forum where disclosure was voluntary and calculated to benefit the disclosing party." The OSG disclosed the existence of a purported policy the details of which do not appear to reside anywhere outside the email chain. Having chosen to assert the existence of a previously undisclosed policy, the OSG cannot now claim that the attorney-client privilege protects the factual details on which it relied when it made that assertion. *See In re Grand Jury Proceedings,* 219 F.3d at 182 ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party.").[FN9] Accordingly, so far as the factual contents of the emails are concerned, the OSG waived any attorney-client privilege that may have attached.

Independently, moreover, the Court further finds that no attorney client privilege attached. As noted above, this privilege attaches only where information "was intended to be and was in fact kept confidential." FOIA specifically requires that agencies make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register." 5 U.S.C. § 552(a)(2)(B). Under § 552(a)(2)(B), to the extent that the OSG's client agencies described an existing but otherwise unknown policy to the OSG, those agencies had a duty under FOIA to make statements of that policy publicly available. Thus, FOIA barred those agencies from intending to keep statements of their policy confidential. Concluding that attorney-client privilege applied would amount to a finding that the client agencies articulated a policy solely for the purposes of litigation. But, of course, agencies cannot limit the application of a policy to a particular case in which having such a policy would prove beneficial. Accordingly, attorney-client privilege did not attach to any factual descriptions of the policy asserted by the OSG in *Nken.*[FN10]

Turning finally to the deliberative-process privilege, this privilege has "a number of purposes:"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp.*, 617 F.2d at 866. "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

*8 While it follows from this that the privilege applies where an agency makes a decision about, for example, what policy to adopt, here the Government concedes that the email chain does not contain "deliberations about creating a new policy to return aliens." Government's Memorandum of Law dated October 28, 2011 at 24. Nonetheless, the Government argues that, because a statute commits to the OSG's discretion the decision of how to present the Government's arguments before the Supreme Court, *see* 28 U.S.C. § 518(a)("[T]he Solicitor General shall conduct and argue suits and appeals in the Supreme Court ...."), the OSG is somehow the relevant agency for application of the deliberative process privilege to the factual contents of the emails.

The Government cites no case in support of this novel construction of the deliberative-process privilege, and the Court declines to adopt it.[FN11] So construed, the deliberative-process privilege would wholly displace the work-product privilege, protecting the same materials without providing the same exceptions. Statutes commit the authority to litigate on the Government's behalf to many different parts of the DOJ. *See, e.g.,* 28 U.S.C. § 515(a) ("The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may ... conduct any kind of legal proceeding, civil or criminal."); 28 U.S.C. §

519 ("[T]he Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."). Surely an Assistant United States Attorney could not make "unilateral testimonial use" of attorney work-product at trial and then claim that the deliberative-process privilege protected that work-product—even though the work-product privilege did not—because 28 U.S.C. § 515(a) gave her and her superiors discretion to decide how to conduct the litigation. Such a result would mean that 5 U.S.C. § 552(b)(5), rather than preserving "normal" discovery privileges for the Government, in fact gave the Government more extensive privileges. Accordingly, the Court declines to adopt the Government's expansive construction of the deliberative-process privilege. Because the Government concedes that the email chain does not contain "deliberations about creating a new policy to return aliens," the Court finds that the deliberative-process privilege does not protect the email chain from disclosure.

In sum, the Court finds that, while the work-product privilege protects those parts of the email chain that do not contain factual descriptions of the policy to which the OSG referred in *Nken*, neither the work-product privilege, nor the attorney-client privilege, nor the deliberative-process privilege protects the parts of the email chain that do contain such factual descriptions. Moreover, the Court finds that the Government has not provided any justification, much less a "detailed justification," for finding that the non-exempt material in the email chain "is not reasonably segregable" from the exempt material. *Mead Data Central*, 566 F.2d at 261. Accordingly, the Court partially grants plaintiffs' motion for summary judgment and orders the Government to disclose the portions of the email chain that contain factual descriptions of the putative policy the existence of which the OSG asserted in *Nken*. Based on its *in camera* review of the email chain, the Court concludes that the following portions contain such descriptions:

*9 (1) in the email sent Wednesday, December 31, 2008 at 5:13 PM, the first sentence of the first paragraph and the entire second paragraph;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

(2) in the email sent Friday, January 2, 2009 at 2:13 PM, the entire second paragraph;

(3) in the email sent Monday, January 5, 2009 at 6:32 PM, the third and fourth sentences;

and (4) in the email sent Wednesday, January 7, 2009 at 12:29 PM, the second and third paragraphs.

Barring further applications, the Government is directed to disclose these portions to plaintiffs by no later than February 13, 2012. In the meantime, the Court will file under seal a complete copy of the entire email chain that it reviewed *in camera.* In all other respects, the plaintiffs' motion is denied and the Government's cross-motion is granted, and the Clerk of the Court is ordered to close documents number 14 and 20 on the docket of this case.

SO ORDERED.

### MEMORANDUM ORDER

Like a flatworm cut in half that returns as two flatworms,[FN1] this case just gets curiouser and curiouser. Many months ago, in response to plaintiffs' request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Government identified a six-page chain of emails that it represented were the documents of the Office of the Solicitor General ("OSG") responsive to the request but as to which the Government claimed privilege. But no sooner had the Court issued its Opinion and Order of February 7, 2012 (full familiarity with which is here presumed) rejecting those claims of privilege than the Government identified, on February 16, 2012, an additional 16 pages of OSG emails responsive to the request, as to which it also claimed privilege. No explanation was offered for the failure to disclose these emails earlier, even though some of them were effectively part of the email chain previously disclosed. The Government did, however, submit to the Court unredacted copies of the new emails, so that the Court could evaluate the claims of privilege. (As in the case of the previously submitted emails, an unredacted copy of the newly-submitted emails will be filed under seal.) Additionally, the Government, having previously moved on February 9 for a 60-day stay of the Court's

February 7 ruling so that the Government could decide whether or not to appeal that ruling, now requests that any such stay also apply to any portions of the new emails that the Court might order disclosed to plaintiffs.

Turning first to whether any portions of the new emails should be disclosed to plaintiffs, the Government concedes that the new emails are of the same kind as those on which the Court previously ruled. Although some of the new emails were sent after the Government filed the Supreme Court brief in *Nken v. Holder* that made the representation about the Government's "policy and practice" in alien removal cases that is the subject of plaintiffs' FOIA request, those emails, prepared in anticipation of oral argument before the Supreme Court, reflect the OSG's further inquiries about the alleged policy and practice, and the Government does not dispute that they are within the scope of the FOIA request. Both sides agree, moreover, that the new emails do not present any claims of privilege different in any relevant respect from those previously considered by the Court.

Applying to the new emails, therefore, the same legal principles set forth in the Court's February 7 Opinion and Order, the Court orders disclosure of:

\*10 (1) the document attached to the email sent Friday, January 9, 2009 at 3:57 PM, *i.e.,* pages 15 and 16 of the newly produced documents; and

(2) in the email sent Friday, January 16, 2009 at 11:54 AM, the entire fifteen-line second paragraph.

Turning to the Government's motion for a 60-day stay while it considers whether to appeal,[FN2] a court considers four factors when deciding whether to grant a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170 (2d Cir.2007) (quoting *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)).

With respect to the first factor, the Government fails

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

to make any particularized arguments of any material weight. Aside from claims that the email segments ordered to be disclosed are not severable from other, privileged segments (a claim refuted on the face of the emails) and that the segments to be disclosed contain "impressions" rather than "facts" (again refuted on the face of the emails), the Government offers only two arguments as to why the February 7 Opinion and Order was (allegedly) erroneous. *See* Government letter dated February 10, 2012, at 2–3.

First, the Government argues that the Court misapplied the "testimonial use" exception to the work-product protection offered under FOIA's exception 5, which requires that the documents in issue be "routinely" or "normally" disclosed. *Cf. FTC v. Grolier, Inc.,* 462 U.S. 19, 26–27, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983). In *Grolier,* the Supreme Court held that the fact that the documents in issue had been *ordered* to be disclosed in a prior, separate litigation did not by itself override the work-product protection in a subsequent litigation, because "[i]t is not difficult to imagine litigation in which one party's need for otherwise privileged documents would be sufficient to override the privilege, but that does not remove the documents from the category of the *normally* privileged." *Id.* at 28. But the reference to "testimonial use" in the Court's February 7 Opinion and Order was in the context of finding that the Government had waived any work-product privilege regarding the segments here disclosed by disclosing their alleged gist (the alleged "policy and practice"). The Government does not cite to any case in which a court has concluded that a party can reclaim a privilege that it has previously waived. Accordingly, the Court finds that this argument does not provide a basis for concluding that the Government will likely succeed on appeal.

Second, the Government argues that the Court's reliance on the provision of 5 U.S.C. § 552(a)(2)(B) that requires disclosure of "statements of policy ... which have been adopted by the agency" was erroneous because "an informal discussion among attorneys does not 'adopt[ ]' a policy." Govt. Letter, 2/10/12 at 3 (citing *Wood v. FBI,* 432 F.3d 78, 84 (2d Cir.2005)). This argument completely misapprehends the Court's Opinion and Order. It was the OSG itself, in its brief in *Nken,* that expressly represented

to the Supreme Court that the Government had adopted a particular "policy" that the Court should rely on. Whether the representation was accurate or inaccurate (which, even with the submission of the new emails, remains problematic), agencies must publish statements of policies they have adopted, *see* 5 U.S.C. § 552(a)(2)(B), and the only thing the Government has listed in response to plaintiffs' FOIA request that even comes close to a particularized statement of the alleged policy and practice is the factual description of it in the email chain, the only part of the chain that the Court has ordered disclosed to plaintiffs.

*11 Despite these weaknesses, however, the Government makes a global argument to the effect that it shows a likelihood of success on appeal simply by pointing out that this case presents some unusual issues as to which very little prior caselaw exists. The Court agrees that the case is, in some respects, a case of first impression. In the analogous context of certifying interlocutory appeals, the Second Circuit has found that the fact that "that ... issues are difficult and of first impression" favors certification. *Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 25 (2d Cir.1990). The same logic applies here: where the district court has had to address issues as to which the appellate courts have provided little direct guidance, the likelihood that an appellate court will take a different approach increases. In such circumstances, a court should hesitate to impose irreparable harm on a party who may seek appeal.

Moreover, the Court finds that the second, third, and fourth factors do, in fact, favor the Government:

With respect to factor two (irreparable injury to the Government) it is obvious "once there is disclosure, the information belongs to the general public." *Nat'l Archives & Records Admin. v. Favish,* 541 U.S. 157, 174, 124 S.Ct. 1570, 158 L.Ed.2d 319 (2004). Thus, failure to stay the disclosure required by the Order would cause the Government irreparable injury if the ruling was erroneous.

With respect to factor three (injury from the stay to other parties), a stay will cause comparatively little harm, if any, to plaintiffs. Although plaintiffs argue strenuously that the Government continues to deport aliens based on the holding in *Nken,* they refer the Court to no specific cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

and they offer nothing more than speculation for the claim that disclosure will induce courts to distinguish *Nken's* holding and prohibit deportation in the relevant circumstances. The proximate harm to plaintiffs themselves, in any event, is simply the delay itself. Although this might loom large if a long delay was granted, at this point the only stay ripe for decision is a stay for 60 days.

With respect to factor four (the public interest), while the Court agrees with plaintiffs that the public has a substantial interest in receiving the information here at issue, the public also has an interest in having disclosures of secretive government documents reviewed by an appellate court.

**\*12** Accordingly, the Court finds, that the Government has satisfied all of the four factors, warranting a 60–day stay in the case. The Court therefore grants that stay, effective today.

SO ORDERED.

> FN1. The source of the saying may be Peter Finley Dunne, the great Irish–American political commentator of the late nineteenth and early twentieth centuries. *See* Peter Finley Dunne, Mr. Dooley's Philosophy 254 (Harper & Bros. Publishers 1906) (1900) ("Thrust ivrybody—but cut th' ca-ards.").

> FN2. Some authorities state that work-product is technically not a "privilege," but instead a "doctrine," *see In re Qwest Commc'ns Int'l, 450 F.3d 1179, 1184 n. 3 (10th Cir.2006),* but the distinction is too obscure to warrant further discussion here.

> FN3. The Government chose neither to controvert plaintiffs' Rule 56.1 Statement of Uncontested Facts nor to propound its own Rule 56.1 statement in support of its cross-motion. Instead, the Government submitted the Declaration of Patricia L. Buchanan dated October 28, 2011, which included two exhibits: a September 2008 Memorandum of Agreement

("MOA") between three components of the DHS and a copy of the Government's original disclosures concerning the four-page email chain at issue in this case.

> FN4. By enacting 5 U.S.C. § 552(b)(5), "Congress intended to incorporate into the FOIA all the normal civil discovery privileges." *Hopkins v. U.S. Dep't of Housing and Urban Dev., 929 F.2d 81, 84 (2d Cir.1991).*

> FN5. Similarly, where agencies claim that "non-exempt material is not reasonably segregable" from exempt material, they must provide a "detailed justification" for that claim. *Mead Data Central, Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 261 (D.C.Cir.1977).*

> FN6. *In re von Bulow* considered the attorney-client privilege rather than the work-product privilege. Nonetheless, selective disclosure of materials that the work-product privilege protects can also distort the judicial process, as the holding in Nobles recognizes.

> FN7. Thus, even if the work-product privilege applied here, FOIA would require disclosure of this information in some unprivileged form. *See* 5 U.S.C. § 552(a)(2)(B) (requiring that an agency make available "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register").

> FN8. Importantly, the OSG did not cite 8 U.S.C. § 1182(d)(5) in support of its claim, but instead identified that statute as the procedural mechanism by which the Government implemented its alleged policy.

> FN9. That the OSG did not explicitly cite the email chain does not mean that it did not "affirmatively rely" on those emails. Otherwise, litigants would have perverse incentives to cite nothing in support of their most dubious factual claims, knowing that, while a court might rely on

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)

(Cite as: 2012 WL 375515 (S.D.N.Y.))

those claims, it could never scrutinize them because of attorney-client privilege.

FN10. Resisting this conclusion, the Government argues that "[f]actual information provided by the client to the attorney is the essence of the privilege." *Vento v. IRS,* 714 F.Supp.2d 137, 151 (D.D.C.2010). While attorney-client privilege certainly protects a client's private information, FOIA prohibits agencies from treating their policies as private information. Thus, attorney-client privilege simply does not apply to statements of policy, at least in the circumstances of this case.

FN11. Of course, the OSG's presentation of the Government's position to a court differs substantially from an offer of legal advice to an agency considering the legal implications of a proposed policy, to which he deliberative-process privilege would often apply. *See Brinton v. Dep't of State,* 636 F.2d 600, 604 (D.C.Cir.1980). Nonetheless, the Government concedes that no agency considered adopting a new policy in the email chain, and thus the OSG could not have offered any legal advice on such a proposal.

FN1. Peter W. Reddien & Alejandro Sanchez Alvarado, "Fundamentals of Planarian Regeneration," 20 Annual Review of Cell and Developmental Biology 725 (2004).

FN2. The Government indicates that, if it does appeal, it will seek a further stay from this Court, but that request is not yet ripe for decision.

S.D.N.Y.,2012.

National Immigration Project of the Nat. Lawyers Guild v. U.S. Dept. of Homeland Sec.
--- F.Supp.2d ----, 2012 WL 375515 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# APPENDIX  B

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**

## 11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens

|  |  |
|---|---|
| **Issue Date:** | February 24, 2012 |
| **Effective Date:** | February 24, 2012 |
| **Superseded:** | N/A |
| **Federal Enterprise Architecture Number:** | 306-112-002b |

1.  **Purpose/Background.** Under the Immigration and Nationality Act (INA), as amended, aliens who petition the circuit courts of appeals for review of their administrative removal orders may continue to litigate their petitions after their removal from the United States. Absent a court-ordered stay of removal, U.S. Immigration and Customs Enforcement (ICE) may lawfully remove such aliens while their petitions for review (PFRs) are pending. This Directive describes existing ICE policy for facilitating the return to the United States of certain lawfully removed aliens whose PFRs are granted by a U.S. court of appeals or the U.S. Supreme Court. This Directive applies only to supervisors in Enforcement and Removal Operations (ERO), Homeland Security Investigations (HSI), and the Office of the Principal Legal Advisor (OPLA). This Directive does not apply to bargaining unit employees.

2.  **Policy.** Absent extraordinary circumstances, if an alien who prevails before the U.S. Supreme Court or a U.S. court of appeals was removed while his or her PFR was pending, ICE will facilitate the alien's return to the United States if either the court's decision restores the alien to lawful permanent resident (LPR) status, or the alien's presence is necessary for continued administrative removal proceedings. ICE will regard the returned alien as having reverted to the immigration status he or she held, if any, prior to the entry of the removal order and may detain the alien upon his or her return to the United States. If the presence of an alien who prevails on his or her PFR is not necessary to resolve the administrative proceedings, ICE will not facilitate the alien's return. However, if, following remand by the court to the Executive Office for Immigration Review (EOIR), an alien whose PFR was granted and who was not returned to the United States is granted relief by EOIR or the Department of Homeland Security (DHS) allowing him or her to reside in the United States lawfully, ICE will facilitate the alien's return to the United States.

3.  **Definitions.** The following definitions apply for purposes of this Directive only:

3.1.  **Facilitate an Alien's Return.** To engage in activities which allow a lawfully removed alien to travel to the United States (such as by issuing a Boarding Letter to permit commercial air travel) and, if warranted, parole the alien into the United States upon his or her arrival at a U.S. port of entry. Facilitating an alien's return does not necessarily

include funding the alien's travel via commercial carrier to the United States or making flight arrangements for the alien.

**3.2.**   **Petition for Review (PFR).**  A request for a U.S. court of appeals to review a removal order entered by ICE or EOIR under 8 U.S.C. § 1252, INA § 242.  The U.S. courts of appeals' PFR decisions are subject to review by the U.S. Supreme Court through a petition for writ of certiorari.

**3.3.**   **Restore an alien to lawful permanent resident (LPR) status**.  To enter a judicial decision which renders non-final an administrative removal order against an LPR.  *See Matter of Lok*, 18 I&N Dec. 101 (BIA 1981) (holding that an LPR retains such status until the entry of a final administrative order of removal), *aff'd*, 681 F.2d 107 (2d Cir. 1982).  Practically speaking this means that, when a PFR is granted that returns a former LPR to the posture of a pre-order alien, the alien will once again, in contemplation of law, be an LPR even though removal proceedings may still be pending before EOIR on remand from the circuit court.

**3.4.**   **Stay of Removal.**  An order issued by EOIR or a federal court which prevents ICE from executing a removal order.

**4.**   **Responsibilities.**

**4.1.**   ERO, HSI, and OPLA supervisors must fully coordinate at the local, international, and Headquarters levels to effectuate this policy.

**5.**   **Procedures/Requirements.**  None

**6.**   **Authorities/References.**

**6.1.**   INA § 101(a)(20), 8 U.S.C. § 1101(a)(20).

**6.2.**   INA § 212(d)(5), 8 U.S.C. § 1182(d)(5).

**6.3.**   INA § 242, 8 U.S.C. § 1252.

**6.4.**   8 Code of Federal Regulations (CFR) § 212.5.

**6.5.**   DHS Delegation Number 7030.2, "Delegation of Authority to the Assistant Secretary for the Bureau of Immigration and Customs Enforcement" (November 13, 2004).

**6.6.**   Memorandum of Agreement (MOA) between United States Citizenship and Immigration Services (USCIS), ICE, and Customs and Border Protection (CBP), "Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States" (September 29, 2008).

3

6.7.  MOA between ICE and CBP, "Significant Public Benefit Parole Protocol for U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement for Law Enforcement Purposes" (September 22, 2005).

6.8.  *Matter of Lok*, 18 I&N Dec. 101 (BIA 1981), *aff'd*, 681 F.2d 107 (2d Cir. 1982).

7.  **Attachments.** None

8.  **No Private Right.** This Directive is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

John Morton
**Director**
**U.S. Immigration and Customs Enforcement**

# APPENDIX  C

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## NOTICE TO REMOVED ALIENS WHO MAY BE SEEKING JUDICIAL REVIEW

**Alien's** Name: _____

A#(s): _____

You have received an administratively final order of removal from an immigration judge, the Board of Immigration Appeals (BIA) or the Department of Homeland Security (DHS). Generally, U.S. Immigration and Customs Enforcement (ICE) is authorized to execute your administratively final removal order, even if you have filed a petition for review (PFR) with a U.S. Circuit Court of Appeals challenging that order. In the event the court grants your PFR, ICE may decide to facilitate your return to the United States following removal. **It is your responsibility to follow any court rules about providing updated address and contact information while your PFR is pending.**

Absent extraordinary circumstances, if you are removed while a PFR is pending, ICE will facilitate your return to the United States under the following circumstances:

(1) If your case is remanded by the court for further administrative consideration and your presence has been ordered by the court or deemed necessary by ICE to resolve your administrative removal proceedings; or

(2) If the court's order has restored you to lawful permanent resident or other status permitting you to be physically present in the United States.

If a decision is made to facilitate your return, the steps ICE will take in your case will depend on whether you will be returning to the United States by air or sea vessel, or by land from Mexico or Canada. ICE will not ordinarily make your travel arrangements or fund the cost of your return travel. If ICE facilitates your return to the United States because a court grants your PFR, you will revert to the immigration status you held, if any, just prior to the administratively final removal order that the federal court has reversed or vacated. **Please note that ICE may detain you upon your return, depending on the circumstances of your case.**

**Contact Information**: If, based on this notice, you believe that ICE should facilitate your return to the United States, please have available your circuit court case number, alien registration number(s) listed above, and a reliable way for ICE to get in touch with you, and contact:

Office of the Public Advocate
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
500 12th Street., S.W.
Washington, DC  20536
T: (202) 732-3100

EROPublicAdvocate@ice.dhs.gov

_____
(Signature of ICE Officer serving order)

_____
(Printed Name and Title of ICE Officer serving order)

(Signature of Alien) _____

(Date) _____

Text version: April 19, 2012

# APPENDIX  D

# Frequently Asked Questions (FAQs) about ICE Policy Directive Number 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens*

**I was ordered removed, and am scheduled to be removed soon.  How will this affect my appeal of my case, which is pending before the U.S. circuit court of appeals?**

As explained in ICE Policy Directive Number 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens*, an alien who appeals his or her final order of removal to a federal circuit court of appeals may continue to litigate his or her case after being removed from the United States.  Your removal will not affect your right to continue to pursue your case before the court.  Although you may be abroad for the pendency of your case, the court of appeals that is currently reviewing your petition for review will nevertheless be able to review and make a decision on your case while you are not in the United States.  In order to ensure that you receive notice of the decision entered by the court in your case, you should follow the court's procedures for providing updated address and contact information.

**What happens if I win my case and the court grants my petition for review after I have been removed?**

Absent extraordinary circumstances, ICE will facilitate your return to the United States if your case is remanded for further proceedings before the Board of Immigration Appeals or the Immigration Court and your presence is necessary for continued adjudication of your case.  This may be because the court specifically ordered your presence, or because the nature of the court's decision requires you to return for further testimony.  ICE may explore other options in lieu of facilitating your return, such as arranging for video teleconferencing or telephonic testimony, if appropriate

If, after your case is remanded, the Board or Immigration Court enters a final and unreviewable decision that permits you to be physically present in the United States, ICE will facilitate your return and you will be able to obtain the status that the Board or Immigration Court has granted you.

**What constitutes "extraordinary circumstances"?**

Extraordinary circumstances include, but are not limited to, situations where the return of an alien presents serious national security considerations or serious adverse foreign policy considerations.

**What if I believe that I need to be present in the United States for my case after I have been removed and the court grants my petition for review?**

Most courts and many foreign embassies have the technology to support your participation in your immigration hearing by either video teleconferencing or by phone.  However, if these alternatives are not available to you in the country to which you were removed, and your presence is required by court

1

order or is otherwise necessary to continue your case, you may request that ICE assist you with your return to the United States. You will need to reach out to ICE to request return to the United States.

**I held lawful permanent resident (LPR) or other lawful immigration status before my removal; if my petition for review was granted, will special rules apply in my case?**

ICE will facilitate your return to the United States if you were an LPR or held other lawful immigration status (which has not yet expired) prior to the entry of a removal order in your case and the court's decision vacates or reverses your removal order.

**Is it my responsibility to contact DHS once I learn that a court has reversed or vacated my removal order?**

Yes. ICE will initiate efforts to facilitate your return only after you have communicated with the agency to request that we do so.

**How do I request assistance from DHS in facilitating my return to the United States?**

Once a court grants your petition for review, you or your representative should contact ICE, which will be responsible for coordinating your return with other DHS components. In particular, you or your representative should contact the ICE Public Advocate, who can be reached at (202) 732-3100 or via email at EROPublicAdvocate@ice.dhs.gov. You should have your circuit court case number and alien registration number available, as well as detailed contact information to allow ICE to get in touch with you.

**Can my lawyer, legal representative, or family member or other advocate contact the Public Advocate on my behalf?**

Yes.

**Will the Public Advocate let me know if ICE has agreed to facilitate my return to the United States?**

The Public Advocate will route your request to the appropriate ICE offices, which will contact you or your representative concerning your potential return to the United States. The Public Advocate will also provide you with a point of contact for this process.

**What does the Public Advocate do after I request ICE's assistance to return to the United States after a court grants my petition for review?**

The Public Advocate will direct your request to ICE Enforcement and Removal Operations (ERO), where an appropriate supervisory official will determine whether to facilitate your return to the United States, based on the considerations explained above. If a decision is made to facilitate your return, the

subsequent process will depend on whether you will be returning to the United States by air or sea, or by land from Mexico or Canada.

If you are returning by air or sea, ERO will work with the ICE Homeland Security Investigations Law Enforcement Parole Unit (LEPU) to arrange for you to be issued appropriate transportation documents by the U.S. Embassy or Consulate abroad. The commercial air or sea carrier will rely upon that documentation to authorize you to board the U.S.-bound flight or vessel. ICE will coordinate with U.S. Customs and Border Protection (CBP) at the port of entry in advance of your arrival by air or sea. If you are traveling by land, ICE will coordinate with CBP personnel at the appropriate port of entry concerning your return to the United States.

### Will I be provided a point of contact in ICE throughout the return process?

Yes. The Public Advocate will advise you as to who is the appropriate ICE point of contact for your case. However, anyone contacting ICE on your behalf who is not your attorney or accredited representative of record will need to complete and send to the ICE designated point of contact a privacy waiver, signed by you, so that case information can be exchanged. The ICE Privacy Waiver form is available on the internet at the following links: http://www.ice.gov/doclib/news/library/forms/pdf/60-001.pdf (English); http://www.ice.gov/doclib/news/library/forms/pdf/60-001-sp.pdf (Español).

The attorney or legal representative of record will need to complete and send a Form G-28 that has been signed by you in order to be able to talk to ICE officials regarding your case. The G-28 form is available on the internet at the following link: http://www.uscis.gov/files/form/g-28.pdf.

### Do I need to fill out any U.S. government forms for ICE to decide whether to facilitate my return to the United States?

No. It is not necessary to complete any forms to begin the return process; the ICE point of contact will let you know if he or she needs additional information. Please make sure you keep ICE updated with reliable contact information, so that ICE may get in touch with you about your case and request further information, as needed.

### Once ICE tells me that it will facilitate my return to the United States, what happens?

*If Returning by Land:*

The ICE point of contact will work with you to identify your anticipated travel dates and U.S. port of entry and coordinate with CBP so that, upon your arrival, you are allowed into the United States to resume your prior lawful immigration status and/or in order to continue to pursue your case.

*If Returning by Air or Sea:*

ICE will contact the appropriate U.S. Embassy/Consulate in the country to which you have been removed to prepare transportation documentation. If/when the U.S. Embassy/Consulate issues transportation

documentation, ICE will then coordinate with CBP so that, upon your arrival, you are allowed into the United States to resume your prior lawful immigration status and/or in order to continue to pursue your case.

## What sort of transportation documentation will the U.S. Embassy or Consulate issue to me?

After ICE has decided to facilitate your return to the United States, you must possess a passport and appropriate transportation documentation to travel to the United States. A transportation/boarding letter is a document issued by a U.S. Embassy or Consulate abroad, allowing you to board a commercial aircraft or maritime vessel to come to the United States. A transportation/boarding letter cannot be issued without a passport or equivalent travel document.

## What do I need to return to the United States?

In order to return to the United States by air or sea, you must have with you a valid passport or equivalent documentation and either a valid immigrant/nonimmigrant visa or a transportation/boarding letter authorizing your return to the United States for purposes of participating in your immigration case. If returning by land, you must have with you appropriate identity documentation, which could include a passport or other government-issued documents.

## What if my country will not issue me a passport?

You will not be able to return to the United States via commercial air carrier or maritime vessel without a valid passport or equivalent travel document, and the United States Government cannot compel another country to issue such documentation. The U.S. Embassy/Consulate will not issue a transportation/boarding letter authorizing your admission without a valid passport or equivalent travel document.

## Am I responsible for making my own travel arrangements to return to the United States?

Yes. You will be responsible for your own travel arrangements and informing the ICE point of contact of your arrangements. ICE's involvement in facilitating your return is generally limited to: (i) reviewing and processing any paperwork necessary for your return; (ii) working with the Department of State, through the U.S. Embassy or Consulate in your country, to obtain a transportation/boarding letter on your behalf; and (iii) and working with CBP to assist in your physical reentry upon arrival.

## Who is responsible for paying for my return trip?

In cases involving removal of an individual from the United States who was subject to an administratively final order and for whom there was no stay of removal in effect at time of his or her removal, that individual will be responsible for incurring the costs for returning to the United States to resume his or her prior immigration status and/or to continue to pursue his or her immigration case.

4

However, as discussed above, ICE will work to ensure that you will be able to travel back to the United States if appropriate.

### I provided the U.S. Embassy with my passport and received a transportation/boarding letter.  I just bought an airline ticket or booked passage on a maritime vessel to return to the United States.  Do I need to let DHS know?

Yes.  You must let your ICE point of contact know when you plan to arrive in the United States so that he or she can coordinate with CBP at the port of entry.

### I am in Mexico or Canada and plan to enter the United States by land at the border crossing.  Will I need a transportation/boarding letter?

No.  Transportation/boarding letters are only required for those arriving by air or sea.  However, you will still need to contact your ICE point of contact and advise him/her of your travel arrangements so ICE can coordinate with CBP at the port of entry.

### How long will it take from the time I request ICE to facilitate my return until my arrival in the United States?

How long this process will take may vary depending on several factors, including whether you return to the United States by land, sea or air, as well as whether you possess a valid passport at the time of the request, how long it takes the U.S. Embassy to prepare a transportation/boarding letter, etc.  Absent unusual circumstances, the length of this process generally ranges from a matter of weeks to a few months.

### If ICE facilitates my return to the United States after my petition for review has been granted, what will my immigration status be, if any?

ICE will regard you as returning to the status you had just prior to the administrative order that the federal court has reversed or vacated.  For instance, if you had been a lawful permanent resident (LPR) just prior to the entry of a final removal order in your case, and the court's decision vacates that order, ICE will consider your LPR status to be reinstated.  LPRs are generally permitted to enter and reside in the United States, and ICE will therefore generally facilitate your return to the United States.  Because ICE regards you as returning you to your prior status, ICE will not treat you as an arriving alien unless you had been charged as an arriving alien prior to removal.

Please be aware that, in most instances, when a federal court reverses or vacates a final removal order, it also remands the case to the Board of Immigration Appeals or to the Department of Homeland Security for further proceedings.  Accordingly, upon return, you will likely continue to be in immigration proceedings until your case is fully decided.  In order to ensure that you receive notices and orders related to any future immigration proceedings, you should follow all rules requiring you to provide updated address and contact information.  The forms for notifying the Immigration Courts (EOIR-33/IC)

and Board of Immigration Appeals (EOIR-33/BIA) of any change in address are available here: http://www.justice.gov/eoir/formslist.htm.

### When ICE facilitates my return to the United States after my petition for review has been granted, will I be detained upon my return?

You may be detained for further immigration proceedings upon your return depending on the circumstances of your case and ICE's assessment of whether you are subject to mandatory detention under the immigration laws or should otherwise be detained because you pose a danger to the community or risk of flight.

### Do I need to pay a fee for ICE to consider whether to facilitate my return to the United States?

No. However, you will generally be responsible for all transportation costs back to the United States and any fees associated with acquiring the required passport or equivalent travel document from your country.

### Who do I contact for status regarding my request to return to the United States?

Once you are assigned an ICE point of contact, your inquiries should be directed to that individual. However, you remain free to contact the Public Advocate with any concerns. The Public Advocate can be reached at (202)732-3100 or via email at EROPublicAdvocate@ice.dhs.gov

### May I now contact the Public Advocate and request assistance from ICE if I was removed and then received a favorable court decision in the past, whether or not I previously sought to return to the United States?

Yes. If you received a favorable court decision in the past after you were removed and are unsure of whether ICE would facilitate your return, you may contact the Public Advocate for further information and evaluation of your request in accordance with ICE Policy Directive Number 11061.1, *Facilitating the Return to the United States of Certain Lawfully Removed Aliens.*

# APPENDIX  E

**UNCLASSIFIED**



| Info Office: | STAFF |
|---|---|

| MRN: | 12 STATE 40718 |
|---|---|
| Date/DTG: | Apr 24, 2012 / 242002Z APR 12 |
| From: | SECSTATE WASHDC |
| Action: | TRIPOLI, AMEMBASSY *ROUTINE*; ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *ROUTINE* |
| E.O.: | 13526 |
| TAGS: | CVIS, CMGT |
| Subject: | PAROLE OF REMOVED ALIENS |

UNCLAS STATE 040718

E.O. 13526: N/A
TAGS: CVIS, CMGT
SUBJECT: PAROLE OF REMOVED ALIENS

1.  This cable outlines the procedures that apply when an alien who was previously removed from the United States, but then successfully appealed the decision, requests assistance in returning to the United States.  If posts are contacted by an alien who appears to fall within this category, they must notify Gary Corse in CA/VO/F/P (CorseGR@state.gov) and advise the alien to contact the U.S. Immigration and Customs Enforcement (ICE) Public Advocate (EROPublicAdvocate@ice.dhs.gov; 202-732-3100).

2.  If ICE determines that it will facilitate the return to the United States of a previously removed alien who prevails on judicial review, it will send a parole notification to post via telegram (Visas 91).  Posts receiving such parole notifications must process these cases as expeditiously as possible, following the standard operating procedures for handling parole cases outlined in 9 FAM 42.1 PN5.1.  For other types of cases, post should follow relevant standard procedures, if available, or contact CA/VO/F/P with any questions.

3.  Posts' assistance in processing these cases as expeditiously as possible is appreciated.

4. Minimize considered.
CLINTON

**Signature:**          CLINTON

---

**Drafted By:**         CA/VO/F/P:JNANTAIS -- 04/24/12 202-663-1250

**Cleared By:**         CA:MDKIRBY CA:RWTHOMAS CA/VO:ERAMOTOWSKI
                        CA/VO/F:PWALSH CA/VO/F/P:WBENT CA/VO/L:DNEWMAN
                        CA/VO/L/A:BHUNT L/A:KHOOKE L/FO:WDODGE DOJ:MDREEBAN
                        DHS:SGROSSMAN M:SMCPARTLAND S/ES-O:JDIAB

**Approved By:**        CA:JLJACOBS
**Info:**

**XMT:**                RRF GUAM; TASK FORCE EAGLE TUZLA BOSNIA UTA

---

**Action Post:**
**Dissemination Rule:**    DIS_CONS_TAGS

## <u>UNCLASSIFIED</u>

# APPENDIX F

BIA
A072 460 864

# United States Court of Appeals
## FOR THE
## SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 5th day of April, two thousand twelve.

Present:

> Guido Calabresi,
> Reena Raggi,
> Raymond J. Lohier, Jr.,
> *Circuit Judges.*

Gee-Her Lee, AKA Ji He Li,

> *Petitioner,*

v.

Eric H. Holder, Jr., United States Attorney General,

> *Respondent.*

12-120-ag
NAC

Petitioner, through counsel, moves for a stay of deportation pending adjudication of his petition for review of an order of the Board of Immigration Appeals denying his motion to reopen his deportation proceedings. Respondent opposes that motion.

Upon due consideration, decision on this motion is DEFERRED to the merits panel. The government is directed to file within 30 days of this order a letter brief not to exceed ten (10) double-spaced pages supplementing its opposition to the motion to stay removal. That filing should address questions raised in <u>National Immigration Project of the National Lawyers Guild v. United States Department of Homeland Security</u>, No. 1:11-cv-3235 (JSR) (S.D.N.Y.), regarding whether, under what procedure, and on what legal basis the government "[b]y policy and practice. . . accords aliens who were removed pending judicial

review but then prevailed before the courts effective relief by, <u>inter alia</u>, facilitating the aliens' return to the United States by parole under 8 U.S.C. [§] 1182(d)(5) if necessary, and according them the status they had at the time of removal."  Brief for the Respondent at 44, <u>Nken v. Holder</u>, 556 U.S. 418, 129 S. Ct. 1749 (2009) (No. 08-681), 2009 WL 45980.  The Court is aware of a recently issued government directive, U.S. Immigration and Customs Enforcement, Directive No. 11061.1, Facilitating the Return to the United States of Certain Lawfully Removed Aliens (Feb. 24, 2012), but requires further detail addressing the questions raised.


FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk